Thomas S. JUST and Lisa P. Just, Shirley M. Bosch, Roger Dosemegan, John Walterman and Barbara Walterman, Eugene Modesti and Minnie Modesti, Gilbert L. Paar and Patricia A. Paar, Charles Domanico and Rosemarie Domanico, Thomas A. Richardson and Fern D. Richardson, Bud Ruter and Bernice Ruter, Ralph V. Tuinstra, Kenneth Waters and Kathy Waters, Thomas Weyker and Maye Weyker, Verlyn Almond and Mildred Almond, Terry A. Andersen and Bettye J. Andersen, William Bachand, John E. Baker, Jr. and Mary E. Baker, Gary K. Bartels and Mary A. Bartels, Marvin Bosteder and Joan Bosteder, Allen Depatie and Delores Depatie, Richard E. Ehmcke and Mary V. Ehmcke, Bob Eliades and Olympia Eliades, Gary Field and June Field, Patrick Garner and Susan Garner, Kermit Hansen and Louise Hansen, Hugh Hardin and Nellie Hardin, Donald Hess and Ethel Hess, May V. Holtz, Dennis J. Jalensky and Laurie A. Jalensky, Lloyd A. Johnson and Ellen A. Johnson, James G. Kairis and Sandra L. Kairis, Richard Kiehlbauch and Pearle F. Kiehlbauch, James Kimes and Linda Kimes, Walter C. Klingenmeyer and Betty Klingenmeyer, Joseph Kristan and Ilona Kristan, Steven H. Kroll and Judith R. Kroll, Jerome Kronenberg and Dorothy Kronenberg, Joseph Kurali and Irma Kurali, Daniel V. Larsen and Karen R. Larsen, Herman Lederhaus and Gertrude Lederhaus, Cary E. Manderfield and Kim M. Manderfield, John W. Mikkonen and Holly D. Mikkonen, Anita J. Oakes, Kenneth Pauls and Virginia Pauls, Myron Payne and Doris Payne, George Perdikaris and Georgia Perdikaris, Mark A. Porcaro, Mark Purdy and Faya

737

Purdy, Kurt Rasmussen and Barbara Rasmussen, Melvin Rose and Nancy Rose, Irene Roselle, James Shalbrack, Robert Smith and Jean Smith, Paul C. Sorensen, Chris Spielman and Susann Spielman, Patrick Sullivan and Janice L. Sullivan, Peter F. Tillema, Dennis Wojak and Pamela A. Wojak, Kenneth Beecher and Susan Beecher, Walter Fleuchaus and Dorothy Fleuchaus, Donald Gillette and Shirley Gillette, Daniel Jensen and Carol Jensen, Plaintiffs-Intervening-Appellants,

v.

LAND RECLAMATION, LTD., a domestic corporation, Defendant-Third Party Plaintiff-Appellant-Petitioner,

GO OF WISCONSIN, INC., a domestic corporation, Defendant-Third Party Plaintiff,

BITUMINOUS CASUALTY CORP., a foreign insurance corporation, Defendant-Third Party Plaintiff-Respondent,†

v.

N. CHRISTIANSON & SON REALTY, Morgenson Century 21, Bear Realty, Remax of Wisconsin, Inc., ERA-Kraemer Realty, L.L. Freeman, Inc., Sidney J. Friedman, Olympic Homes Sales Associates, Inc., Olympic Homes Construction Corporation, Steven Kroll, Shirley Bosch, Rosemarie Domanico, Roger Dosemagen, Cary Manderfield, Kim Manderfield, John Mikkonen, Eugene Modesti, Myron Payne, James Shalbrack, John Walterman, Third Party Defendants.

Supreme Court

*No. 88-1656. Argued April 24, 1990.—Decided June 19, 1990.*

†Motion for reconsideration filed.

(Also reported in 456 N.W.2d 570.)

For the defendant-third party plaintiff-appellant-petitioner, there were briefs by *Joseph J. Muratore, Sr., Joseph J. Muratore, Jr.* and *Joseph J. Muratore, S.C.,* Racine and oral argument by *Joseph J. Muratore, Sr.*

For the defendant-third party plaintiff-respondent there was a brief by *J. Ric Gass, Vicki L. Arrowood* and *Kasdorf, Lewis & Swietlik,* Milwaukee and oral argument by *Mr. Gass.*

Amicus curiae brief was filed by *Gregory B. Conway* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay and *Thomas J. Dawson,* Wisconsin Public Intervenor, of counsel, and *Eugene R. Anderson, Thomas G. Rozinski* and *Anderson, Kill, Olick & Oshinsky,* New

York, New York, of counsel, for Wisconsin Public Intervenor, Chemical Manufacturers Association, Wisconsin Paper Council, Wisconsin Academy of Trial Lawyers and Wisconsin's Environmental Decade.

Amicus curiae brief was filed by *Robert C. Burrell* and *Borgelt, Powell, Peterson & Frauen,* Milwaukee and *Thomas W. Brunner, Marilyn E. Kerst, John W. Cavilia* and *Wiley, Rein & Fielding, Washington, D.C.,* of counsel, for Wisconsin Insurance Alliance and Insurance Environmental Litigation Association.

WILLIAM A. BABLITCH, J. Plaintiffs in this case are property owners in Racine county who live near a landfill site operated by Land Reclamation, Ltd. (LRL). The plaintiffs' complaint alleges that the landfill was the source of unexpected and unintended pollution causing them bodily injury and property damage. The liability insurance policy issued by Bituminous Casualty Corporation (Bituminous) to LRL excluded pollution damages unless such damages were "sudden and accidental."

The court of appeals agreed with Bituminous that the word "sudden" in the phrase "sudden and accidental" unambiguously means abrupt and immediate and therefore the damages alleged do not come within the coverage of the policy. The property owners argue that their damages are covered by the policy because the word "sudden" is ambiguous and may reasonably mean unexpected and unintended. The phrase is not defined in the policy. Recognized dictionaries differ in the primary meaning of the word. The insurance industry itself has attached different meanings to the word at different times.

We conclude that the word is reasonably susceptible to different meanings and is therefore ambiguous. It is a

741

long standing principle of law that any ambiguity in an insurance contract must be construed in favor of the insured, particularly when such ambiguity appears, as it does here, in an exclusionary clause. We therefore hold that unexpected and unintended pollution damages are not excluded from coverage in the insurance policy. The decision of the court of appeals is reversed, and the matter is remanded to the trial court for further proceedings.

The LRL landfill is licensed for operation as a sanitary landfill by the Wisconsin Department of Natural Resources. In 1987, the plaintiffs commenced this action against LRL. Subsequently, Bituminous was pleaded into the action in the plaintiffs' second amended complaint.

Plaintiffs generally allege that over the course of time LRL operated the landfill negligently and in violation of federal, state and local law, rules, ordinances and regulations, resulting in water contamination, noise, dust, smells and blowing garbage. Individual plaintiffs also allege assorted medical problems and a local increase in the pest population. The allegations do not pinpoint any specific dates of discharges within the policy period.

Bituminous issued comprehensive general liability, comprehensive catastrophe liability and commercial umbrella liability policies to LRL from 1971 until September 1, 1986. The policies contained the following language in exclusion (f), the pollution exclusion:

> This insurance does not apply:
>
> . . .
>
> (f) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or

body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental . . ..

All of the policies issued by Bituminous to LRL afforded coverage for damages caused by an "occurrence." The final set of policies, covering periods from 1980 through 1986, defined "occurrence" as: "an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the insured[.]"[1]

The policies also included a duty to defend clause. In July 1987, Bituminous originally undertook to defend LRL, but it withdrew in January, 1988, denying coverage for the allegations in the lawsuit citing the applicable policy provisions, and, in particular, exclusion (f), the policy's pollution exclusion. Bituminous then filed a motion for summary judgment in July, 1988, on grounds that the applicable policy provisions did not provide coverage for LRL for the facts as alleged in the plaintiffs' complaint and the facts of the case.

The trial court granted Bituminous' motion for summary judgment. In its memorandum decision dated August 3, 1988, the trial court cited three Wisconsin cases as controlling, *Clark v. London & Lancashire Indemnity Co.,* 21 Wis. 2d 268, 124 N.W.2d 29 (1963); *City of Milwaukee v. Allied Smelting Corp.,* 117 Wis. 2d 377, 344 N.W.2d 523 (Ct. App. 1983); and *State v. Mauthe,* 142 Wis. 2d 620, 419 N.W.2d 279 (Ct. App.

---

[1]That there has been an occurrence within the language of the Bituminous policy is not contested on appeal. Therefore, we are concerned only with the applicability of exclusion (f), the pollution exclusion. The policies in effect from 1971 to 1972 and 1972 to 1979 contain language differences that are irrelevant to consideration of this case.

1987). Based on these cases, the trial court found that the term "sudden and accidental" did not apply to pollution damage occurring over a substantial period of time. The trial court then determined, based on this construction, that the record in this case did not contain any allegations of any events which raised genuine issues of material fact that could result in coverage. LRL appealed, and the plaintiffs joined LRL as intervenors on the appeal.

The court of appeals affirmed the trial court's grant of summary judgment concluding that the phrase "sudden and accidental" unambiguously means accidental and immediate. LRL petitioned this court for review pursuant to sec. 808.10, Stats., and we granted the petition.

■

The dispositive issue in this case is one of contract interpretation. The insurance policy itself does not define the meaning of the terms "sudden and accidental." The interpretation of words or clauses in an insurance contract is a question of law which this court decides independently of the decisions of the lower courts. *Garriguenc v. Love,* 67 Wis. 2d 130, 133, 226 N.W.2d 414 (1975).

■

In interpreting the definition of the phrase "sudden and accidental," we must first determine whether the language is ambiguous when used in the context of the policy's exclusionary clause.[2] Words or phrases in a contract are ambiguous when they are susceptible to more

---

[2]Several courts have held the fact that the terms "sudden and accidental" are not defined in the policy of insurance is itself enough to establish that the pollution exclusion clause is ambiguous. *See, e.g., Buckeye Union Ins. v. Liberty Solv. & Chem.,* 477 N.E.2d 1227 (Ohio App. 1984).

than one reasonable interpretation. *Katze v. Randolph & Scott Mut. Fire Ins.,* 116 Wis. 2d 206, 213, 341 N.W.2d 689, 692 (1984). If we determine that the phrase is ambiguous, we must construe the ambiguity in favor of coverage.

Bituminous argues that the phrase "sudden and accidental" unambiguously means abrupt or immediate. We agree that one meaning of the phrase "sudden and accidental" is abrupt or immediate; we disagree that such definition is the only meaning that can reasonably attach to the phrase. When determining the ordinarily understood meaning of a word or phrase, it is appropriate to look to definitions in a recognized dictionary. *Lawver v. Boling,* 71 Wis. 2d 408, 414, 238 N.W.2d 514 (1976). In doing so, we find that recognized dictionaries differ on the meaning of the term "sudden." Webster's Third New International Dictionary (1986) defines "sudden" in a variety of different ways. Webster's first defines the term as "happening without previous notice . . . occurring unexpectedly . . . not foreseen . . .." *Id.* at 2284. Only later does Webster's define the word "sudden" in any sense of timeliness, listing the synonyms "prompt" and "immediate." *Id.* In contrast, the Random House Dictionary of the English Language, (2d ed. 1987), first defines the word "sudden" in temporal terms as "happening, coming, made, or done quickly . . .." *Id.* at 1900. The very fact that recognized dictionaries differ on the primary definition of "sudden" is evidence in and of itself that the term is ambiguous.

The Georgia Supreme Court recently stated in *Claussen v. Aetna Cas. & Sur. Co.,* 380 S.E.2d 686, 688 (Ga. 1989):

> Perhaps, the secondary meaning is so common in the vernacular that it is, indeed, difficult to think

of 'sudden' without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. But, on reflection one realizes that, even in its popular usage, 'sudden' does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, it's spring. *See also* Oxford English Dictionary, at 96 (1933) (giving usage examples dating back to 1340, e.g., 'She heard a sudden step behind her'; and, 'A sudden little river crossed my path As unexpected as a serpent comes.')

We conclude that the phrase "sudden and accidental" is susceptible to more than one reasonable meaning, including abrupt and immediate as Bituminous claims as well as unexpected and unintended as the property owners claim. Thus the phrase "sudden and accidental" contained in the pollution exclusion clause is ambiguous.

When ambiguous language appears in an insurance contract, we must construe the ambiguity in favor of the insured and against the insurance company that drafted the ambiguous language. *Mercado v. Mitchell,* 83 Wis. 2d 17, 25, 264 N.W.2d 532 (1978). This court has consistently stated that this is especially true of exclusionary clauses. *E.g., Meiser v. Aetna Casualty & Surety Co.,* 8 Wis. 2d 233, 238, 98 N.W.2d 919 (1959). Therefore, our conclusion that the phrase is ambiguous requires that we apply the interpretation favoring the insured, and reject the insurers argument that the phrase "sudden and accidental" has only a temporal meaning within the exclusionary clause. We therefore conclude that the phrase "sudden and accidental" means damages that are unexpected and unintended.

746

This conclusion comports with substantial evidence indicating that the insurance industry itself originally intended the phrase to be construed as "unexpected and unintended." This court may examine extrinsic evidence as an aid to determining the meaning of contract language when an insurance contract is ambiguous. *See Hope Acres, Inc., v. Harris,* 27 Wis. 2d 285, 291, 134 N.W.2d 462 (1965).

Significantly, the insurance policies at issue in this case are standard form comprehensive general liability (CGL) policies that were developed by insurance industry trade associations, which are comprised of almost every major American insurance company.[3] Standard form CGL policies have been in use since the 1940s. *See* Sayler & Zolensky, *Pollution Coverage and the Intent of the CGL Drafters: The Effect of Living Backwards,* Mealey's Lit. Rpts. (Insurance) 4,425, 4,427 (1987).

Industry-wide revisions of standard CGL provisions occurred in 1966 and again in 1973. Most early CGL policies provided coverage for property damage or personal injury "caused by accident," a term which was not defined in standard form CGL policies. The insurance industry's failure to define this term led to great uncertainty about what constituted an "accident." In *Clark,* 21 Wis. 2d at 276, this court was called upon to interpret the phrase "caused by accident," and concluded that

---

[3]The 1966 standard form policy was produced by the National Bureau of Casualty Underwriters, later known as the Insurance Rating Board, and the Mutual Insurance Rating Bureau. In 1971, the Insurance Rating Board and the Mutual Insurance Rating Board merged to form the Insurance Services Offices, Inc., which is currently responsible for revising standard form CGL insurance policies. Bradbury, *Original Intent, Revisionism, and the Meaning of the CGL Policies,* 1 Envir. Claims J. 279, 280–81 (Spring 1989) (Bradbury).

damage from gradual pollution was not covered. However, several other jurisdictions reached the opposite conclusion and found that damages arising from gradual pollution were in fact "caused by accident." In order to clarify the scope of coverage provided by the standard form CGL policy, and respond to policyholder demand for expanded coverage, the insurance industry substantially revised the standard form CGL policy in 1966. Tyler & Wilcox, *Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy,* 17 Idaho L. Rev. 497, 499 (September 1981).

The standard form policy introduced in 1966 entirely abandoned the phrase "caused by accident." This change was "in response to consumer demands for broader liability protection and in acquiescence to the judicial trend toward a more expansive reading of the term *accident . . ..*" *Id.* (Footnote omitted.) The new standard occurrence-based policy provided coverage for damage resulting from an "occurrence," which was defined as:

> 'an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended* from the standpoint of the insured.' *Id.* (Emphasis added.)

This change in the policy language was widely touted as an important expansion of CGL insurance coverage. Numerous representatives of insurance industry trade associations and the insurance companies that drafted the revised standard form CGL policy actively promoted this policy as providing new, broadened coverage for liabilities arising from gradual pollution. Bradbury at 283. At least with respect to environmental

claims, contemporaneous industry commentary on the 1966 CGL policy indicates that there was no intent to avoid coverage for unexpected or unintended pollution. G.L. Bean, Assistant Secretary, Liberty Mutual Insurance Company, in a paper presented at the Mutual Insurance Technical Conference, stated: " '[I]t is in the waste disposal area that a manufacturer's basic premises-operation coverage is liberalized most substantially.' " Pendygraft, Plews, Clark & Wright, *Who Pays for Environmental Damage: Recent Developments in CERCLA Liability and Insurance Coverage Litigation,* 21 Ind. L. Rev. 117, 141 (1988) (Pendygraft).

Lyman J. Baldwin, Jr., Secretary of Underwriting, Insurance Company of North America, amplified this understanding in 1966:

> 'Let us consider how this would apply in a fairly commonplace situation where we have a chemical manufacturing plant which, during the course of its operations, emits noxious fumes that damage the paint on buildings in the surrounding neighborhood. Under the new policy there is coverage until such time as the insured becomes aware that the damage was being done.' Pendygraft at 142.

The pollution exclusion at issue here was added by a 1973 revision. Under this exclusion, only pollution-related losses that arose from occurrences both "sudden" and "accidental" would be covered. According to various commentators, the exclusion was designed to decrease claims for losses caused by expected or intended pollution by providing an incentive to industry to improve its manufacturing and disposal processes, and unintentional or unexpected damages would still be covered as an "occurrence" under the policy. *Broadwell Realty v. Fidelity & Cas.,* 528 A.2d 76, 84–85 (N.J. Super. Ct. App. Div. 1987); *see also* Hurwitz and Kohane, *The Love*

*Canal-Insurance Coverage for Environmental Accidents,* 50 Ins. Coun. J. 378–79 (July 1983) (Hurwitz and Kohane).

Contemporaneous representations by the insurance industry confirm that the drafting committee, in creating the exclusionary clause, clarified but did not reduce the scope of coverage. This expressed intent was also the interpretation relied upon by insurance regulators in approving the exclusionary clause when it was submitted for approval to various state insurance commissioners by representatives of the insurance industry.

In May 1970, both insurance industry trade associations, (the Mutual Insurance Rating Bureau and the Insurance Rating Board,) submitted the standard pollution. exclusion for approval by state regulatory authorities throughout the country. *U.S. Fid. & Guar. v. Specialty Coatings,* 535 N.E.2d 1071, 1077 (Ill. App.), *appeal denied,* 545 N.E.2d 133 (1989). The Insurance Rating Board offered the following explanation of the exclusion:

> 'Coverage for pollution or contamination is not provided in most cases under present policies because damages can be said to be expected or intended and thus are excluded by the definition of occurrence. *The above exclusion clarifies this situation* so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident . . ..' Price, *Evidence Supporting Policyholders in Insurance Coverage Disputes,* 3 Nat. Resources & Envir. 17, 48 (Spring 1988). (Emphasis added.)

Some states questioned whether the purpose of the pollution exclusion was "limiting the coverage and not clarifying it." The Mutual Insurance Rating Bureau, which assisted in the draft of the exclusion endorsement, in a submission to the West Virginia Commissioner of

Insurance, explained that the intent of the clause was to clarify " 'that the definition of occurrence excludes damages that can be said to be *expected or intended.*' " *See* Pendygraft at 154. (Emphasis added.) On the basis of this and similar representations, the West Virginia Insurance Commissioner approved the exclusion, stating:

> The [insurance] companies and rating organizations have represented to the Insurance Commissioner, orally and in writing, that the proposed exclusions . . . are merely clarifications of existing coverages as defined and limited in the definitions of the term 'occurrence,' contained in the respective policies to which said exclusions would be attached. Price at 48.

Furthermore, documents presented by the Insurance Rating Board to the Georgia Insurance Commissioner when the pollution exclusion clause was first adopted suggest that the clause was intended to exclude only intentional polluters. The Insurance Rating Board represented " 'the impact of the [pollution exclusion clause] on the vast majority of risks would be no change. It is rather a situation of clarification . . . Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued . . ..' " *Claussen v. Aetna Cas. & Sur. Co.,* 676 F. Supp. 1571, 1573 (S.D. Ga. 1987), *question certified,* 865 F.2d. 1217 (11th Cir. 1989), *certified question answered,* 380 S.E.2d. 686, (Ga. 1989), *and later op.,* 888 F.2d 747 (11th Cir. 1989).

An excerpt from *The Fire, Casualty & Surety Bulletin,* used by insurance agents and brokers to interpret standard insurance policy provisions, also supports this interpretation:

'In one important respect, the exclusion simply reinforces the definition of occurrence. That is, the policy states that it will not cover claims where the "damage was expected or intended" by the insured and the exclusion states, in effect, that the policy will cover incidents which are sudden and accidental—unexpected and not intended.' Hurwitz and Kane at 379.

Against this backdrop, a majority of other jurisdictions reaching the issue have interpreted the pollution exclusion clause and the phrase "sudden and accidental," as simply a restatement of the definition of "occurrence." In other words, the policy will cover claims where the injury was "neither expected nor intended." *See, e.g.,* cases cited in *Broadwell Realty,* 528 A.2d at 83–86; *see also* cases cited in *Claussen v. Aetna Cas. & Sur. Co.,* 865 F.2d 1217, 1218 (11th Cir. 1989); Rhodes, 12 *Couch on Insurance 2d,* sec. 44A:122 (Rev. Ed. 1981 & Supp.); Annotation, *Construction and Application of Pollution Exclusion Clause in Liability Insurance Policy,* 39 ALR4th 1047 (1985).

One of the first such cases arising in New York, *Farm Family Mut. Ins. Co. v. Bagley,* 64 A.D.2d 1014, 409 N.Y.S.2d 294, 296 (1978), involved a crop spraying operation which caused damage to a neighboring vineyard. The trial court granted the insurer's motion for summary judgment on the grounds of the pollution exclusion, but the New York appellate court reversed, concluding that the language of the exclusion was "not free from ambiguity . . .."

Three years later, the same court expanded upon this decision in *Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (1980), which involved damages caused by the defendant's leaking gasoline storage tank:

Thus, the negligent installation or maintenance of the storage tank could result in an accidental discharge or escape of gasoline which would be both 'sudden and accidental' though undetected for a substantial period of time (see *Employees Insurance Co. of Alabama v. Rives,* Ala., 87 So. 2d 653). Also the word 'sudden' as used in liability insurance need not be limited to an instantaneous happening *(McGroarty v. Great American Ins. Co.,* 43 A.D.2d 368, 351 N.Y.S.2d 428, affd. 36 N.Y.S.2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172). The term 'sudden and accidental' must be construed in its relevant context. The relevant context to be considered is the fact that it is a term employed by an insurer in the contract and should be given the construction most favorable to the insured. *Id.*

The New York Appellate Court affirmed this ruling again in *Niagara County v. Utica Mut. Ins. Co.,* 80 A.D.2d 415, 439 N.Y.S.2d 538 (1981). In explaining the rationale behind the pollution exclusion, which under New York law, is required in all policies issued to commercial or industrial enterprises, the court stated that the exclusion was calculated to buttress New York's strict environmental protection standards, which could be undermined if commercial enterprises were able to purchase insurance to protect themselves from liability arising from their pollution of the environment. After concluding that Niagara County was not an intentional polluter, the court affirmed the lower court's rejection of the insurer's pollution exclusion defense, and ordered it to defend the county in the now celebrated Love Canal litigation.

Other states have also construed the pollution exclusion clause in this fashion. The Washington Court of Appeals addressed the issue in *United Pacific Ins. v. Van's Westlake Union,* 664 P.2d 1262 (Wash. App.),

*review denied,* 100 Wash. 2d 1018 (1983), which again involved a suit brought against the owner of a leaking underground gasoline storage tank. That court held that the trial court had correctly determined that the damages were covered by the policy. The court concluded that the pollution exclusion clause was solely meant to deprive active polluters from coverage, and not to apply where the damage caused was neither expected nor intended. *Id.* at 1264 (citing *Niagara County,* 427 N.Y.S.2d at 174). The court went on to explain that to hold otherwise "would permit the ambiguous pollution exclusion clause to unfairly devour much of the policy and relieve the insurer from liability . . .." *Van's Westlake,* 664 P.2d at 1266. *See also Time Oil Co. v. CIGNA Property & Casualty Ins. Co.,* No. C88-1235R, 4 TXLR 1359 (W.D. Wash. April 2, 1990) (noting that the *Van's Westlake* decision was consistent with the Washington Supreme Court's decision in *Anderson & Middleton Lumber Co. v. Lumberman's Mutual Casualty Co.,* 333 P.2d 938 (Wash. 1959), which held that the meaning of " 'the word "sudden," . . . in common usage, is not "instantaneous" but rather 'unforeseen and unexpected.' ").

In *Jackson Tp., Etc. v. Hartford Acc. & Indem.,* 451 A.2d 990 (N.J. Super. L. 1982), the court summarized the case law on the pollution exclusion clause from other jurisdictions, and concluded in light of the case law that the clause should be interpreted as covering claims where the injury was "neither expected nor intended." The court then proceeded to address the implications of the inclusion of the term "sudden" in the pollution exclusion clause:

> The frequency of dumping is not dispositive of the issue of whether the occurrence was sudden or accidental. If the inquiry is, as it should be, whether

the pleadings charged the insured with an act resulting in unintended or unexpected damage, then the act or acts are sudden and accidental regardless of how many deposits or dispersals may have occurred, and although the permeation of pollution into the ground water may have been gradual rather than sudden, the behavior of the pollutants as they seeped into the aquifier is irrelevant if the permeation was unexpected. *Id.* at 994.

The New Jersey Superior Court reaffirmed its *Jackson Township* decision two years later, in *CPS Chem. Co. v. Continental Ins. Co.,* 489 A.2d 1265, 1270-71 (N.J. Super. L. 1984), *reversed on other grounds,* 495 A.2d 886 (App. Div. 1985). In that case, CPS Chemical and thirty three others were named as defendants in a suit brought by the city of Philadelphia, arising out of the illegal dumping of toxic wastes, generated by the defendants, in a city dump. The court held that because the hauler's illegal disposal of CPS's wastes were unexpected and unforeseen by CPS, the insurer had to provide coverage under the "sudden and accidental" exception to the pollution exclusion clause. The court explained that it may well have been that the drafters of this clause believed that "sudden and accidental" connoted a sense of dramatic catastrophe immediate in its consequence, but it could not fairly be said that this was unambiguously expressed. *Id. See also Summit Assoc. v. Liberty Mut. Fire Ins.,* 550 A.2d 1235, 1238-39 (N.J. Super. A.D. 1988).

Ohio has also adopted this construction of the pollution exclusion clause. In *Buckeye Union Ins. v. Liberty Solv. & Chem.,* 477 N.E.2d 1227, 1234 (Ohio App. 1984), which involved another leaking hazardous waste disposal facility, the court concluded that a "sudden" occurrence is not necessarily an instantaneous one, but merely one

which has happened without previous notice or on very brief notice. Since there were no allegations that the insured in that case intended or expected the release of hazardous substances, the court held that the pollution exclusion clause did not preclude coverage.

This interpretation was followed in *Kipin Industries v. American Univ. Ins.*, 535 N.E.2d 334, 338 (Ohio App. 1987), which stated:

> We interpret the non-applicability clause (emphasized above) in the same way as does the Court of Appeals . . . in *Buckeye Union*, . . . an interpretation that is with the weight of authority. In brief, this interpretation is that an event is 'sudden and accidental' and thus not excluded from comprehensive coverage if the damaging result is neither expected nor intended by the insured. *Id.* (citing *Jackson Twp. Municipal Utilities Auth. v. Hartford Acc. & Indemn. Co.* [1982], 186 N.J. Super. 156, 162–64, 451 A.2d 990, 993–994). The clause must be construed strictly against the insurer because it is ambiguous in meaning and its subject matter is an exclusion from what is stated to be comprehensive coverage against liability. We find in the record before us a 1970 circular to the members of the Insurance Rating Board that, in discussing exclusion (f), states that the clause is intended to clarify the definition of 'occurrence' so as to exclude coverage for expected or intended results. *Id.*

Illinois has also cited the above-referenced case law with approval. In *Reliance Ins. Co. of Illinois v. Martin*, 467 N.E.2d 287, 289 (Ill. App. 1984), the court reversed the trial court's granting of the insurer's summary judgment motion, holding that fumes and soot from the insured's parking garage entered a neighboring condominium "at diverse times and over a period of time" did not mean it was not "sudden and accidental." The court

stated that the relevant question is not the time frame involved but whether the insured could have intended or expected carbon monoxide and soot to enter the condominium.

More recently, the Illinois Appellate Court reiterated that the wording of the pollution exclusion demonstrates "that any unintentional or unexpected contamination would still be covered as an 'occurrence' under the policy." *U.S. Fid. & Guar. v. Specialty Coatings,* 535 N.E.2d at 1077.

Michigan courts have also equated the word "sudden" as used in the pollution exclusion clause with the word "unexpected." *Jonesville Prod. v. Transamerica Ins. Group,* 402 N.W.2d 46 (Mich. App. 1986), *leave to appeal denied,* 428 Mich. 897 (1987). This holding was reaffirmed in *Upjohn Co. v. New Hampshire Ins. Co.,* 444 N.W.2d 813, 817 (Mich. App. 1989), where the court stated that "even a continuous discharge of chemicals may be both accidental (i.e., unintended) and sudden (i.e., unexpected) and, therefore, outside the pollution exclusion." *See also Polkow v. Citizens Ins. Co. of America,* 447 N.W.2d 853, 856 (Mich. App. 1989). *But see Ray Industries, Inc. v. Liberty Mutual Ins. Co.,* 728 F. Supp. 1310 (E.D. Mich. 1989); *Fl Aerospace v. Aetna Cas. & Sur. Co.,* 897 F.2d 214 (6th Cir. 1990).

Of course, this is not to say that all courts which have interpreted the pollution exclusion clause have concluded that the phrase "sudden and accidental" is ambiguous. However, the fact that substantial conflicting authority exists with respect to the "correct" interpretation of the exclusionary terms merely serves to strengthen the conclusion that the terms are susceptible to more than one meaning, and thus ambiguous. *See Grinnell Mut. Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495, 499 (Minn. App. 1988). Although we acknowledge

that the mere controversy concerning the meaning of a contract term does not itself establish an ambiguity, this type of comprehensive debate dispels the insurers contention that the exclusionary language is clear. *See U.S. Fidelity and Guar. Co. v. Thomas Solvent Co.,* 683 F. Supp. 1139, 1155-56 (W.D. Mich. 1988).

Nevertheless, Bituminous insists that Wisconsin courts have implicitly rejected the line of cases which define "sudden and accidental" to mean "unexpected or unintended." *E.g., Allied Smelting,* 117 Wis. 2d at 382-386; *Mauthe,* 142 Wis. 2d at 624-29; *Wagner,* 145 Wis. 2d at 615-18.

*Allied Smelting* involved damage caused by the insured's discharge of acid into the sewer system over a period of time, causing deterioration and extensive repairs. *Id.* at 381. Allied Smelting's insurer moved for summary judgment based on a standard form pollution exclusion clause apparently identical to the clause at issue in the present case.[4] In holding the exclusionary clause applicable, the court of appeals reiterated the rationale of our 1963 *Clark* decision as applied to the phrase "sudden and accidental." The court of appeals stated in *Allied Smelting,* 117 Wis. 2d at 385-86:

> When a condition is caused by accident, our supreme court has limited coverage to: 'injuries caused by a sudden and identifiable event with respect to both location and time. This is intended to rule out exposure injuries, incurred over a period of time, such as the harmful effects of obnoxious fumes,

---

[4]The court of appeals in *Allied Smelting* used the phrase "sudden and accidental" and "sudden or accidental" interchangeably. However, the contract in that case utilized the standard exclusionary clause language, i.e., "sudden *and* accidental." Therefore, we believe the clause as represented in the disjunctive in *Allied Smelting* was an inadvertent typographical error.

stream pollution, vibration or noises.' *See Clark v. London & Lancashire Indemnity Co. of America,* 21 Wis. 2d 268, 283, 124 N.W.2d 29, 36–37 (1963).

However, *Allied Smelting* improperly construed the phrase "sudden and accidental" in light of the obsolete accident-based policy existing at the time of *Clark* rather than the occurrence-based policy introduced in 1966, the pollution exclusion added in 1973, and the changes in circumstances attending those enactments. These errors have been perpetuated by the subsequent court of appeals decisions relying on the *Allied Smelting* definition of "sudden and accidental." Because of the differences in the involved policies, *Allied Smelting, Mauthe,* and *Wagner* are not controlled by *Clark,* and thus the law set forth in those cases must be overruled.

Finally, Bituminous argues that interpreting the policy language as excluding expected or intended damages will contravene public policy because "businesses, if they believed that in the future the court would rewrite their insurance policy to provide free insurance, would have a reduced incentive to either avoid polluting practices or insure themselves adequately." However, this argument does not square with the ambiguous nature of the policy. As the Michigan Supreme Court has cautioned, " '[t]he courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, when all question might have been avoided by a more generous or plainer use of words.' " *Powers v. Detroit Auto. Inter-Ins. Exchange,* 398 N.W.2d 411, 419 (Mich. 1986). We agree that more precise wording, or a definition of "sudden and accidental," if used by the insurers in drafting the policy, would have put the matter beyond reasonable question. The complete elimination of any exception to the exclusion,

759

as was done in the policy in effect from September 1, 1985, to September 1, 1986, would have accomplished the same purpose.

Therefore, we conclude that the phrase "sudden and accidental," contained in the pollution exclusion clause, means unexpected and unintended damages. Because the exclusionary clause does not preclude coverage, and the allegations in the complaint together with the depositions, interrogatories and affidavits raise inferences that could support a recovery covered by the policy, the insurance carriers have a duty to defend. Summary judgment should not have been granted. Accordingly, the decision of the court of appeals is reversed and the matter remanded to the trial court for further proceedings.

*By the Court.*—The decision of the court of appeals is reversed and cause remanded to the trial court for further proceedings.

STEINMETZ, J. (dissenting). The majority has used linguistic legerdemain, "Now you see it, now you don't" by interpreting the clear words "sudden and accidental" to be ambiguous and as a result to mean unexpected or unintended. In its zeal to provide insurance coverage where it does not exist, it has changed an insurance policy into an assurance policy. With its interpretation, an insurance policy is not a risk contract but a guarantee for all damages. The policy now becomes a deep pocket to pay for business mistakes. There is no explanation of how a dump site for human wastes can ever be free of pollution of some sort. However, it does not matter because after this decision, an operator who is able to obtain an assurance policy will no doubt have to agree to an indemnification clause from the insured to the insurer. From now on only government units will

have deep enough pockets to license dump sites and pay for damages caused. There is no longer any reason for an owner to carefully operate a dump site because under the language of this policy as construed by the majority, all negligently caused damages are now covered, as long as the damages are not deliberate, or are unintentional, or are unexpected, even though pollution discharges from a landfill site most likely can be expected.

While I agree with the majority that exceptions or exclusions in insurance policies are generally to be strictly construed against the insurer, I note that strict construction does not permit a strained construction. *Bulen v. West Bend Mut. Ins. Co.*, 125 Wis. 2d 259, 264, 371 N.W.2d 392 (Ct. App. 1985). Strict construction against an insurer also does not allow a court to rewrite a policy to bind an insurer to a risk that it did not contemplate and for which it has not set a premium. *Id.* Because I find that the majority relies on a strained review of dictionary definitions of the term "sudden" to construe the phrase "sudden and accidental" in the pollution exclusion in order to find the ambiguity necessary to make its case, I dissent.

I disagree with the majority that the phrase "sudden and accidental" is ambiguous when used in the context of the policy's pollution exclusion clause. The majority finds its ambiguity through a comparison of dictionary definitions of the term "sudden." *See* majority op. at 745–746. While at first glance the differing "primary" definitions might create confusion, the problem is clarified through review of the stated fact that the Webster's Third New International Dictionary generally lists its definitions according to earliest ascertainable meaning. *See* Preface, Webster's Third New International Dictionary 6a (1961). In contrast, the Random House Dictionary states that it generally lists the most frequently

761

used meanings of a word first. *See* Random House Dictionary of the English Language xxxii (2d ed 1987). Since the Random House Dictionary lists the most frequently used meaning of "sudden" to be that with a temporal denotation, "happening, coming, made or done quickly . . ." *(Id.* at 1900), it cannot necessarily be asserted that an ambiguity arises as to "primary meaning" of the term.

The point is made, however, that dictionary definitions of "sudden" denote both a temporally restricted element and an element of unexpectedness. "Primary meaning" aside, I do not find an inherent ambiguity within this contest of dictionaries. I conclude that the phrase is unambiguous because the term "sudden," within the context of the phrase, necessarily adds a temporal element. The strained reading adopted by the majority reduces the term to mere surplusage.

In context, the term "sudden" is connected by the conjunction "and" to the term "accidental." Thus, the pollution exclusion requires that the discharge in question be shown to be both "sudden *and* accidental" before coverage is afforded. The plain meanings of the terms "accident" and "accidental," derived from a recognized dictionary, plainly denote both the unexpected and unintended. *See* Webster's at 11. The term "sudden," read in context, adds nothing and is therefore meaningless unless its plain meaning is construed to add the element of brevity, the temporal element, to the characterization of the polluting discharge.

Precedent in this state confirms this plain meaning construction. Although the specific construction of the phrase "sudden and accidental" presents an issue of first impression to this court, in *Clark v. London & Lancashire Indemnity Co.,* 21 Wis. 2d 268, 277, 124 N.W.2d 29 (1963), an analogous fact situation was presented. The

issue was "whether damages caused by a long-continuing course of action, in the nature of the maintenance of a nuisance, constitutes damages 'caused by accident' within the meaning of the policy." In *Clark,* this court reviewed the weight of authority, which in turn followed well-settled rules of construction, to conclude that injury caused by long-term exposure could not be said to be "caused by accident" as the plain meaning of the term "accident" denotes a sudden and identifiable event in relation to both location and time. *Id.* at 279, 283.

As the majority notes, the insurance industry switched from the accident-based policy construed in *Clark* to the broader coverage of an "occurrence"-based policy. Subsequently, the pollution exclusion was introduced. *See generally* Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo. L.J. 1237, 1240, 1246 (1987). Notwithstanding these changes, the Wisconsin court of appeals has repeatedly, and I find correctly, construed the phrase "sudden and accidental" within the pollution exclusion as containing a temporal element.

In *City of Milwaukee v. Allied Smelting Corp.,* 117 Wis. 2d 377, 344 N.W.2d 523 (Ct. App. 1983), the city of Milwaukee claimed that Allied Smelting had, over a period of time, discharged acid into its storm sewer system causing sufficient deterioration to require extensive repairs. Allied Smelting's insurer moved for summary judgment based on the pollution exclusion contained in its policy. The court of appeals relied on *Clark* to state that coverage under the pollution exclusion was limited to injuries caused by a sudden and identifiable event with respect to both location and time. Thus, the court of appeals concluded through *Clark* that the pollution exclusion was intended to eliminate coverage for exposure injuries incurred over a period of time. *Id.* at

385-86. The *Allied Smelting* court found that the testimony established that the repeated discharges complained of had taken place over a two to ten-year period. Therefore, the court of appeals concluded that "the record and common sense stand in firm refutation of" the contention that the discharge in the case was sudden and accidental. *Id.* at 386.

In 1987, the court of appeals relied on both *Clark* and *Allied Smelting* to deny coverage under the pollution exclusion when the contamination had been linked to the slow seepage of chromium acid through cracks in the cement floor of Mauthe's chromium plating business. *State v. Mauthe,* 142 Wis. 2d 620, 419 N.W.2d 279 (Ct. App. 1987). The *Mauthe* court confirmed the temporal element of "sudden and accidental" as determinative of the issue without regard to whether the conduct of the insured could otherwise be characterized as intentional. *Id.* at 626-27.

Recently, the court of appeals in *Wagner v. Milwaukee Mut. Ins. Co.,* 145 Wis. 2d 609, 612, 427 N.W.2d 854 (Ct. App. 1988), analyzed the pollution exclusion in accord with *Mauthe* and *Allied Smelting*'s conclusions to find coverage. In *Wagner,* the evidence demonstrated that a sudden discharge of a pollutant could be linked at a specific date and time to the accidental piercing of an underground pipe. That the polluting discharge continued over a course of years until discovered was irrelevant when a sudden and accidental discharge was identifiable. *Id.* at 616-17.

Under the plain meaning construction that I would adopt, I find no discernible conflict between this court's interpretation of "accident" in *Clark* and reliance on *Clark* by *Allied Smelting* and *Mauthe* and perpetration of this plain construction in *Wagner.* I therefore disagree with the majority that these court of appeals cases

should be overruled. As stated, "accident" was construed in *Clark* as containing an element of suddenness or a temporal element. The industry transition to an occurrence-based policy broadened coverage and effectively removed *Clark*'s absolute, temporal construction of the term "accident" so as to include coverage for damages occurring over time. I read the plain language of the pollution exclusion, however, as expressly reinstating the temporal element of suddenness to trigger coverage. The court of appeals apparently realized this because *Allied Smelting, Mauthe* and *Wagner* properly applied the pollution exclusion as written. None of these cases found or discussed any ambiguity in the policy language. Likewise, all three cases focused on the nature of the discharge leading to the loss and whether that discharge was sudden and accidental rather than focusing on the loss itself. The insured's expectations, knowledge and intentions concerning the resulting harm were considered irrelevant. *See generally* Note, 74 Geo. L.J. at 1251-53, 1262, 1264-68 and notes.

Because I conclude that the phrase "sudden and accidental" is unambiguous, I would not consider other case law relied upon by LRL. *See Bartel v. Carey,* 127 Wis. 2d 310, 316-17, 379 N.W.2d 864 (Ct. App. 1985) (a clause is not rendered ambiguous simply because other jurisdictions conclude that it is ambiguous).

Also, consideration of extrinsic evidence is prohibited when construing unambiguous language.[1] *Hope Acres, Inc. v. Harris,* 27 Wis. 2d 285, 291, 134 N.W.2d 462 (1965). In addition, there is no allegation that such

---

[1]I note that the majority does not specifically refer to any extrinsic evidence of early representations from Wisconsin insurance agencies when reviewing the "intended meaning" of the pollution exclusion. Absence of such evidence leads me to conclude that it is apparently nonexistent.

765

representations were relied on in Wisconsin by the public or by the Wisconsin Insurance Commissioner.

LRL also argues that the Wisconsin cases are not dispositive because they do not analyze the "sudden and accidental" language of exclusion (f) in light of the "continuous or repeated exposure" language within the definition of "occurrence." LRL asserts that the temporal construction of "sudden and accidental" renders the "continuous or repeated exposure" language in the policy superfluous.

I disagree. My review of the policy in light of this argument is guided by the principle that "a construction which gives reasonable meaning to every provision of a contract is preferable to one leaving part of the language useless or meaningless." *Stanhope v. Brown County,* 90 Wis. 2d 823, 848–49, 280 N.W.2d 711 (1979). This court has specifically applied this principle to insurance contracts stating that " '[a] construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent.' " *Id.* at 849 (quoting *Inter-Insurance Ex. v. Westchester Fire Ins. Co.,* 25 Wis. 2d 100, 130 N.W.2d 185 (1964)).

Contrary to this argument, I conclude that a plain construction of the exception to exclusion (f) does not render the "continuous and repeated exposure" language within the occurrence definition superfluous. Rather, it is LRL's interpretation that neutralizes exclusion (f).

Upon review, the policy's plain language covers occurrences to include those developing over a course of time. The policy then excludes or stops coverage only for pollution-caused harms. The pollution exclusion, however, contains an exception which reinstates coverage when it can be proved that the polluting discharge was

sudden and accidental. The court of appeals correctly noted exclusion (f)'s function within the policy:

> Exclusion (f) is not completely coterminous with the definition of a 'continuous and repeated exposure' occurrence. It operates to exclude only continuous pollution, not all continuous events. Continuing types of 'occurrences,' as defined, are covered unless the occurrences arise out of pollution events; those are not covered unless such pollution events are sudden and accidental. Read as a whole, the policy covers 'continued and repeated exposure' except for exposures to pollution; then it covers only 'sudden and accidental' events. Therefore, exclusion (f) does not render the 'continuous and repeated exposure' clause superfluous; that clause maintains its vitality when discharge of pollutants is not at issue. (Citation omitted.)

*Just,* 151 Wis. 2d at 603.[2]

Having determined that the language of the pollution exclusion is unambiguous, I reach the second issue of whether the record reveals any dispute of material fact showing or raising a reasonable inference that the alleged pollution discharges were sudden and accidental.

---

[2]Other jurisdictions have also concluded that exclusion (f) is unambiguous. *See, e.g., U.S. Fidelity & Guar. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir. 1988); *U.S. Fidelity & Guaranty Co. v. Morrison Grain Co.,* 1990 U.S. Dist. LEXIS 3682 (Kan. March 20, 1990); *Ray Industries, Inc. v. Liberty Mut. Ins. Co.,* 728 F. Supp. 1310 (E.D. Mich. 1989); *Intern. Minerals v. Liberty Mut. Ins.,* 168 Ill. App. 3d 361, 522 N.E.2d 758 (Ill. App. Ct.) *review denied* 530 N.E.2d 246 (1988); *Barmet of Indiana v. Security Ins. Group,* 425 N.E.2d 201 (Ind. Ct. App. 1981); *Technicon Electronics v. Am. Home Assur.,* 141 A.D.2d 124, 533 N.Y.S.2d 91 (A.D. 2 Dept. 1988); *Lower Paxton Tp. v. U.S. Fid. & Guar. Co.,* 383 Pa. Super. 558, 557 A.2d 393 (Pa. Super. 1989).

In essence, this issue asks whether the granting of summary judgment to Bituminous was proper. LRL argues that, ambiguity issue notwithstanding, the record in this case allows at least a reasonable inference that some of the alleged pollution discharges fall within the policy coverage as "sudden and accidental" discharges.

Summary judgment is frequently used by insurers to raise the question of whether the policy issued to the insured covers the injuries, damages or liabilities alleged. *Jones v. Sears Roebuck & Co.*, 80 Wis. 2d 321, 325, 259 N.W.2d 70 (1977). Summary judgment is governed by sec. 802.08, Stats.[3] It must be granted by the trial court if no material issues of fact exist because the purpose of summary judgment is to avoid trial when there is no conflict. *See Hunter of Wisconsin, Inc. v. Hamilton*, 101 Wis. 2d 460, 470, 304 N.W.2d 752 (1981). When reviewing a summary judgment decision, this court follows the same standards as the lower courts. *See Kremers-Urban Co. v. American Employers Ins.*, 119 Wis. 2d 722, 733, 351 N.W.2d 156 (1984).

---

[3]Relevant language of sec. 802.08, Stats., summary judgment, provides:

(2) MOTION . . .. The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

(3) SUPPORTING PAPERS . . .. When a motion for summary judgment is made and supported as provided in this section, an adverse party may not rest upon the mere allegations or denials of the pleadings but the adverse party's response, by affidavits or as otherwise provided in this section, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against such party.

Thus, a court reviewing a summary judgment order first examines the pleadings to determine whether claims have been stated and material factual issues presented. If the complaint states a claim and the pleadings show the existence of factual issues, the court examines the moving party's (here Bituminous's) affidavits for evidentiary facts admissible in evidence or other proof presented to determine whether that party has made a prima facie case for summary judgment. To make a prima facie case for summary judgment, a moving party must show a defense which would defeat the claim. If the moving party has made a prima facie case for summary judgment, the court examines the affidavits submitted by the opposing party for evidentiary facts and other proof to determine whether a genuine issue exists as to any material fact from which reasonable conflicting inferences may be drawn necessitating a trial. *See Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980).

On the issue of granting summary judgment, LRL contends that Bituminous did not meet its burden to present a prima facie case for summary judgment. I disagree. A prima facie case for summary judgment is established when evidentiary facts are stated which if they remain uncontradicted by the opposing party's affidavits resolve all factual issues in the moving party's favor. *Walter Kassuba, Inc. v. Bauch,* 38 Wis. 2d 648, 655, 158 N.W.2d 387 (1968).

In support of its motion for summary judgment, Bituminous submitted a chart on which was compiled the plaintiffs' complaints based on the allegations in their second amended complaint and a review of their deposition testimonies. Bituminous also relied on the express language of the plaintiffs' complaint and an itemization of the plaintiffs' claims to illustrate that no

sudden and accidental discharges of pollutants on specifically defined dates had been alleged to trigger coverage under the policy. Since Bituminous showed that the evidentiary facts fell outside the sudden and accidental discharge requirement for coverage as I interpret the language, it made its prima facie case.

LRL next argues that its affidavits in rebuttal show that material facts as to a sudden and accidental discharge are in dispute. I conclude that these affidavits are fatally flawed. Various allegations of blowing debris lack the specificity of time and date, and in some instances the source of the debris, which are necessary to fall within the plain meaning interpretation of policy coverage. Indeed, one particular allegation presented by LRL occurred after Bituminous stopped providing insurance coverage to LRL. My review of these affidavits leads me to conclude that they assert a constant and on-going problem affected only by wind changes.

LRL also offered an affidavit concerning contamination of three of the plaintiffs' wells. However, the statement that "water samples taken [in October, 1986] from three wells near the landfill were found bacteriologically unsafe," shows only that the wells were contaminated. This and other affidavits contained no evidence to link LRL's operations to the contamination or show that the contamination was possibly the result of a sudden and accidental discharge from the landfill as opposed to a long-term seepage of leechate.

Finally, LRL relied on the language from the plaintiffs' second amended complaint. However, the complaint alleges throughout that LRL's tortious actions occurred "over the course of time." Thus, this complaint avers only that LRL engaged in a continuous and long-standing activity which has caused the alleged pollution problems. From my reading of the pollution exclusion,

these affidavits do not rebut Bituminous's defense negating coverage under the policy.

Beyond the evidence in the record, LRL claims on appeal that summary judgment is premature since plaintiffs' discovery is incomplete. According to LRL, the summary judgment order only dismissed Bituminous from the action; the plaintiffs' complaint was not dismissed. Therefore, LRL asserts that the possibility exists that evidence may yet be discovered by the plaintiffs which would trigger coverage under the Bituminous policy. Tandem to this argument, LRL contends that the court of appeals erroneously placed a burden on it to prove at summary judgment that a sudden and accidental discharge exists. According to LRL, this burden would not normally fall to it because it does not know what the plaintiffs will be able to prove until trial.

These arguments are not persuasive. First, in order to defeat a motion for summary judgment, sec. 802.08, Stats., places the burden on an opposing party to set forth specific facts showing that there is a genuine issue for trial in order to defeat the moving party's motion. *See* Section 802.08(3), Stats.; *see also Bank of Two Rivers v. Zimmer,* 112 Wis. 2d 624, 632, 334 N.W.2d 230 (1983); *Board of Regents v. Mussallem,* 94 Wis. 2d 657, 289 N.W.2d 801 (1980).

Thus, on summary judgment, the burden initially fell to Bituminous to show that it is not liable under its policy of insurance because exclusion (f) applies. Then the burden fell to LRL to affirmatively rebut Bituminous's defense by showing the existence of an aspect of coverage, a sudden and accidental event, which would trigger coverage under the policy. *See Fischer & Porter Co. v. Liberty Mut. Ins. Co.,* 656 F. Supp. 132, 140 (E.D. Pa. 1986). My review of the record indicates that LRL is unable to meet its burden.

Second, the court of appeals rejected LRL's argument based only on the possibility that the plaintiffs may yet come forward with evidence of a sudden and accidental discharge. I find that the court of appeals rationale properly disposes of this argument:

> This is insufficient to raise the issue that LRL had insufficient *opportunity* to develop the necessary evidentiary record. We note too that this argument gave the trial court no idea of why further discovery may reveal what discovery up to that point has not revealed, or who is to be deposed, and it is an argument entirely speculative in nature. It asserts no more than that some fact supporting coverage might be divulged should LRL conduct a 'fishing expedition' of unknown length and in unknown waters. Such an argument dispels, rather than creates, doubt that the material facts of the case have been uncovered.

*Just,* 151 Wis. 2d at 606–07 (emphasis in original).[4]

In that LRL offered no specific arguments to the trial court to show that incomplete discovery might yet lead to coverage under the policy, I agree with the court of appeals that any such arguments were waived on appeal. *See Driver v. Driver,* 119 Wis. 2d 65, 349 N.W.2d 97 (1984); *Hasselstrom v. Rex Chainbelt, Inc.* 50 Wis. 2d

---

[4]The record reflects that the plaintiffs were aware of Bituminous's motion for summary judgment. The plaintiffs filed a memorandum to the circuit court in opposition to the motion in which they agreed with and adopted LRL's arguments. The plaintiffs also made an appearance at the hearing on the motion for summary judgment and argued in opposition to it. Surely, had LRL or the plaintiffs been able to point to some evidence during the policy period that a sudden and accidental discharge of pollutants had occurred, it would have been to their advantage to set the instance forth at that time. No such evidence was presented.

487, 184 N.W.2d 902 (1971). Because Bituminous's duty to defend is based on whether coverage is afforded under the policy and because I find no evidence presented on summary judgment which triggers coverage, I conclude that Bituminous has no duty to defend. Therefore, I would hold that the trial court did not err in dismissing Bituminous from the action.

I conclude that the plain meaning of the term "sudden and accidental" in exclusion (f), the pollution exclusion, is unambiguous and contains a temporal element found in the plain meaning of the word "sudden." I also conclude that affidavits and other proof presented to rebut the prima facie case for summary judgment do not support the necessary existence of a genuine issue of material fact showing that a polluting discharge was sudden and accidental. Therefore, I find Bituminous is entitled to summary judgment as a matter of law.

I would therefore affirm the decision of the court of appeals.