**BILL CALL FORD, INC.,
et al., Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. 5:91 CV 242.**

United States District Court,
N.D. Ohio, E.D.

Aug. 18, 1993.

Timothy A. Shimko, Sr., Shimko & Associates, Cleveland, OH, Edward C. Baran, Jr., Baran, Piper, Tarkowsky & Fitzgerald, Mansfield, OH, John P. Calandra, Jr., Baran, Piper, Tarkowsky & Fitzgerald, Thomas G. Lobe, John F. King, Hofelich & King, Cleveland, OH, for plaintiffs.

James B. Niehaus, Daniel W. Hammer, Sr., Michael E. Smith, Thompson, Hine & Flory, Cleveland, OH, for defendant.

### ORDER ADDRESSING COUNT SIX

SAM H. BELL, District Judge.

#### PREFACE

*The parties have moved for summary judgment on all counts of the complaint. The court has addressed each motion by separate opinion. They are, in essence, a trilogy. Because some orders, for the sake of efficiency, reference others made in this matter, the court suggests that a reader peruse them in the order they were prepared. The order of drafting is this: (1) opinion addressing count eight, 830 F.Supp. 1034, (2) opinion addressing count six, 830 F.Supp. 1045, (3) opinion addressing counts one, two, three, four, five and seven, 830 F.Supp. 1053.*

## I. Introduction

Currently before the court is defendant's motion for summary judgment on count six

of plaintiffs' complaint, Docket # 46. In count six, the plaintiffs seek treble damages for the defendant's alleged failure to adequately compensate plaintiffs for warranty service performed by them on behalf of Ford. (Amended Complaint at ¶¶ 19–20) The plaintiffs have responded to the motion relative to this count. The following opinion is devoted to the defendant's motion.

## II. Standard of Review

The court has previously addressed the summary judgment standards applicable to the instant matter. (*See* Order Addressing Count Eight). To avoid needless repetition, those standards have been omitted in this opinion although they are, of course, a pertinent guide for review of the instant motion. If particularly germane, the court shall revisit the dictates of Rule 56 in the legal analysis which follows.

## III. Law and Analysis

Ford raises five grounds in support of its motion for summary judgment: 1) that count six is barred because appeal to the Dealer Policy Board is a condition precedent to filing any lawsuit, 2) Count six is barred by the applicable one year statute of limitations, 3) count six is barred by reason of Call Ford's failure to exhaust administrative remedies, 4) the current version of § 4517.52 cannot be applied to the pre-existing contract between the parties, and 5) Call Ford is estopped from asserting or has waived the claim made in count six. The court shall address these contentions *seriatim*.

On March 14, 1980, the following law passed by Ohio General Assembly came into effect:

(A) Each franchisor shall adequately and fairly compensate each of its franchisees for labor and parts used to fulfill warranty and recall obligations or repair and servicing. Each franchisor shall file a copy of its warranty and recall reimbursement schedules or file a copy of its warranty and recall reimbursements schedules or formulas with the motor vehicle dealers board. The schedules or formulas shall be reasonable with respect to the time and compensation allowed a franchisee for the warranty and recall work, reimbursement procedures, and all other conditions of such obligations. The reasonableness of the schedules or formulas shall be subject to the determination of the board, when a franchisee or dealer organization files a notice of protest with the board.

(B) In determining the adequacy and fairness of a franchisor's warranty and recall reimbursement schedules or formulas, the principal factors to be considered by the board shall be the prevailing wage rates being paid by the franchisee in the community in which the franchisee is doing business, except that the compensation of a franchisee for warranty and recall service and parts shall not be at less than the rates charged by the franchisee to its retail customers for like service and parts for nonwarranty work. The schedules or formulas shall include a reasonable allowance of time for the diagnosis and performance of repairs by a technician of ordinary skill.

Ohio Rev.Code § 4517.52 (1980), *amended by*, Ohio Rev.Code § 4517.52 (1987) (*See* Defendant's Exhibit 4).

On October 1, 1980, Call Ford and Ford executed a Sales and Service Agreement [hereinafter "Franchise Agreement"], pursuant to which plaintiffs operated as a Ford dealer in Mansfield, Ohio. Pursuant to that agreement, Ford would reimburse plaintiff for warranty work in accordance with the provisions of the warranty manual or campaign instructions and the dealer's approved warranty rate. (*See* Franchise Agreement, Defendant's Appendix, Exhibit 1 at 8 ¶ 4(b)(4)) In so doing, Call Ford submitted warranty reimbursement claims to Ford through Ford's Direct Warranty Entry ("DWE") system (a software package for submitting claims which provides overnight notification of the claims' disposition). (Defendant's Motion, Docket # 46, Exhibit 1 at ¶ 7).

The Franchise Agreement also provided: Any protest, controversy or claim by a Dealer (whether for damages, stay of action or otherwise) with respect to any termination or nonrenewal of this agreement by the Company after any termination or nonrenewal of this agreement by the Company or the Dealer has become effective,

shall be appealed by the Dealer to the Policy Board within fifteen (15) days after the Dealer's receipt of notice of termination or nonrenewal, or as to settlement of accounts after termination or nonrenewal, within one year after the termination or nonrenewal has become effective. Appeal to the Policy Board shall be a condition precedent to the Dealer's right to pursue any other remedy available under this agreement or otherwise available under law. The Company, but not the Dealer, shall be bound by the decision of the Policy Board.

(*Id.* at 17 ¶ 18(b)).

Effective October 22, 1987, Ohio repealed the then existing version of § 4517.52 and enacted the following version:

(A) Each franchisor shall compensate each of its franchisees for labor and parts used to fulfill warranty and recall obligations of repair and servicing at rates not less than the rates charged by the franchisee to its retail customers for like service and parts for non-warranty work.

Ohio Rev.Code § 4517.52.

The defendant argues that paragraph 18(b) of the Franchise Agreement establishes a condition precedent to the claim raised by count six and that, having failed to satisfy this condition, plaintiffs' claim is barred. The court agrees.

Paragraph 18(b) of the Franchise Agreement provides that any claim by the dealer with respect to the settlement of the accounts of the Dealer and the Company after termination of the Franchise Agreement shall be appealed by the Dealer to the Policy board within one year after the termination has become effective. (*See* Franchise Agreement, Defendant's Appendix, Exhibit 1 at 17 ¶ 18(b)). The contract specifically provides that such appeal is a condition precedent to "the Dealer's right to pursue any other remedy available under [the franchise agreement] or otherwise available under law." (*Id.*) The court believes the instant matter squarely falls within the language of this section, despite plaintiffs' view to the contrary.

■ First, plaintiffs argue that "[t]he franchise was transferred to James Graham, the franchise was not terminated or not renewed ... [t]herefore section 18(b) does not apply to Plaintiff's claims." (Plaintiffs' Brief in Opposition, Docket # 65 at 5) In support of this proposition, plaintiffs cite this court to the sale agreement executed by plaintiffs and Graham Ford and to Mr. Call's affidavit, which states: "[t]he franchise was transferred to James Graham, the franchise was not terminated or not renewed." (*Id.*, Exhibit A at ¶ 5) The court believes plaintiffs are in error. The Sales Agreement states:

[plaintiff/seller] is presently the designated dealer/operator under the franchise agreements with Ford/Chrys. [plaintiff] and [Graham/buyer] as soon as practicable following the signing of this agreement will make the appropriate presentations to Ford/Chrys for [buyer] to become the dealer/operator and at the appropriate time [plaintiff/seller] *will resign to bring about the issuance of the sales and service agreements from Ford/Chrys to [Graham/buyer].*

(*Id.*, Exhibit B at 2 ¶ H) The court must surmise that this is precisely what happened in the case at bar. Plaintiff, despite his affidavit to the contrary, sent a letter to Ford tendering the termination of the Franchise Agreement. That letter stated:

I write on behalf of Mid–Ohio Ford, Inc, *which hereby voluntarily resigns its Ford Sales and Service Agreement dated October 1, 1980;* in addition to which Mid–Ohio Ford hereby resigns its Rent–A–Car System Agreement and Lease Agreement dated February 9, 1983; *as well as any other sales and service agreements currently in force between Ford Motor Company and Mid–Ohio Ford, Inc.*

Mid–Ohio Ford, Inc. has examined in detail the Ford Sales and Service Agreement dated October 1, 1980 and in particular those paragraphs dealing with *termination or non-renewal of agreement, termination benefits, obligations upon termination,* re-acquisition of company products, and dealership facility assistance. *Mid–Ohio Ford, Inc. has determined that it does not seek any of the termination benefits specified in the agreement and*

*rejects such benefits.* Accordingly, no general release will be forthcoming.

This resignation will be effective upon the appointment of James F. Graham, or his designee, as the replacement dealer in Mansfield, Ohio, upon which appointment Ford may then accept this resignation.

(Defendant's Motion, Docket # 46, Exhibit 5B) A few months later, Ford accepted this resignation:

This will acknowledge receipt and acceptance of your written notice of resignation, dated March 8, 1990, upon the terms stated·therein, *terminating as of May 2, 1990 the Ford Sales and Service Agreement dated October 1, 1980,* Foreign Vehicle Sales Agreements (Courier) dated October 1, 1980, and (Fiesta) dated October 1, 1980, Ford Rent–A–Car System Agreement dated June 10, 1981, and Ford Authorized Leasing System Agreement dated February 9, 1983 between you and Ford Motor Company.

(Defendant's Motion, Docket # 46, Exhibit 5A) Upon the basis of this documentation, the court can only conclude that plaintiff is mistaken in his affidavit—the record taken as whole overwhelmingly indicates that the agreement was not transferred, but was in fact terminated. Apart from plaintiff's contradictory affidavit, there is simply no evidence that the Franchise Agreement was assigned or transferred to Graham Ford.

Plaintiff asserts three points as "proof" that "the passing of the franchise from William Call to James Graham was indeed a transfer of the franchise, not a nonrenewal or termination of the franchise." (Plaintiff's Brief in Opposition, Docket # 65 at 2–3) This "proof" is: (1) The Buy/Sell contract with Graham Ford contemplated the "transfer" of the franchise, (2) the Franchise Agreement at ¶ 17(b)(1) speaks, in part, speaks of "transfer" of the franchise, and (3) the fact that the sale of assets would be of substantially less value if the transfer of the franchise was not included. (*Id.*) The court disagrees with plaintiffs' reasoning.

The Buy/Sell only speaks to the franchise in two places:

WJC is presently the designated dealer/operator under the franchise agreements with Ford/Chrys. WJC and JFG as soon as practicable following the signing of this agreement will make the appropriate presentations to Ford/Chrys for JFG *to become the dealer/operator and at the appropriate time WJC will resign to bring about the issuance of the sales and service agreements from Ford/Chrys. to JFG.*

*Transfer of Franchises*—It is specifically agreed between Sellers and Buyers that they shall mutually pledge their best efforts to obtain the transfer of the franchises (Ford/Chrys) Sellers to Buyer. In the event this approval from both (Ford/Chrys) franchises is not obtained within 90 days of the date of this agreement, then and in that event, Sellers and/or Buyer may terminate this agreement without further obligation to the other.

(Plaintiff's Opposition, Docket # 65, Exhibit 6 at·2, 13) The portion of the Franchise Agreement cited by plaintiffs states:

**TERMINATION OR NONRENEWAL OF AGREEMENT**

**17.(b)·** *By Company Due to Events Controlled by Dealer.* The following represent events which are substantially within the control of the Dealer and over which the Company has no control, and which are so contrary to the intent and purpose of this agreement as to warrant its termination or nonrenewal:

**(1)** Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege or obligation under this agreement; **or** transfer by operation of law or otherwise, of the principal assets of the Dealer that are required for the conduct of DEALERSHIP OPERATIONS; **or** any change, however accomplished, without the Company's prior·written consent, which consent shall not be unreasonably withheld, in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F.

(Plaintiff's Opposition, Docket # 65, Exhibit D at 15 ¶ 17(b)(1)) (non-titular bold type added for emphasis). The decreased worth of

the Buy/Sell Agreement without transfer is proven by Mr. Call's deposition. (*Id.* at Exhibit A ¶ 7) The court must now determine the quality of this "proof".

As for the Buy/Sell Agreement between plaintiff and Graham, it must be noted that while that document can be said to "contemplate" transfer, an equally convincing case may be made that the contract "contemplated" termination of the franchise. Similarly, ¶ 17(b)(1) of the Franchise Agreement, as the bold type indicates, only contemplates *termination* of the Agreement upon transfer or attempted transfer by the Dealer.[1] As this court notes in the opinion addressing count eight of the complaint, at best, assignment may only be had with the consent of the franchisor, a consent which is unrestricted. Finally the court accepts as true Mr. Call's statement that the asset purchase would be of less value if the franchise was not included. The court believes that this "proof" does not afford plaintiff the benefit he seeks.

While these documents and reasoning tend to prove that transfer of the franchise *may have been possible*, and was, perhaps, *contemplated* they do not prove that transfer *in fact occurred*. Those same documents, as noted above, give an equally compelling view of the possibility of termination. As this court notes in the order disposing of count eight of plaintiffs' complaint, "the very theme of the Franchise Agreement is that Ford may pick and choose future franchisees on its own terms." This, they apparently did by means of a new contract with Graham. Again, there is no evidence, such as a copy of the Ford/Graham Ford Franchise Agreement, that the franchise was simply assigned to Graham. There is evidence, however, of termination in fact, in the form of plaintiff's own signed letter which is replete with language of resignation and termination, and Ford's response thereto, which also speaks of termination. Further, the Buy/Sell agreement between plaintiffs and defendant was

just that, a simple asset purchase. While it may have *contemplated* a transfer or assignment, there is no evidence that plaintiff ever in fact *assigned* his rights. Simply put, proof of contemplation does not constitute proof that the contemplated event occurred. Plaintiff's affidavit contradicting his own contemporaneous correspondence is, it is believed, only a scintilla of proof on this issue, rendering summary judgment appropriate. This view is strengthened, albeit unnecessarily, by the evidence developed on consideration of the motions relative to count eight of the complaint. In his brief on that count, plaintiffs' counsel states that a limited franchise was "transferred" to Mr. Graham. (*See* Docket # 76 at 5) Nevertheless, the document counsel cites to support this proposition, the contract between Ford and Graham paving the way for this purported "transfer" states:

> Subject to the consummation of the Buy–Sell Agreement between Mr. Graham and Mid–Ohio, Mr. Graham, or his corporate designee, and Ford *will enter into a standard Ford Dealer Sales and Service Agreement ("Franchise Agreement") for the Mansfield market.*

(Docket # 76, Exhibit 14, Memorandum of Understanding between Ford and Graham).

It therefore seems quite clear that the Agreement came to an end in May of 1990. The Supreme Court has succinctly stated that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'". *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must conclude that this is such an "issue". There is no genuine issue that the Franchise Agreement was terminated.[2]

With this established, our sole remaining inquiry is whether the instant case concerns claims with respect to settlement of accounts.

---

1. A plain reading of this paragraph indicates that the "consent" language relied upon by plaintiff only modifies action constituting change in the ownership or management of the Dealer.

2. This is not to say, however, that this was not a "sale or *transfer of the business and assets or all*

*or a controlling interest in the capital stock of a new motor vehicle dealer [which] contemplated or [was] conditioned upon a continuation of the franchise relationship with the franchisor...."* under Ohio Rev.Code § 4517.56(F).

The plaintiffs claim that it does not or may not. The court disagrees. Plaintiffs argue that the Franchise Agreement should be construed under Michigan law, that that law dictates construction of ambiguous terms against the Franchisor and that the contract is ambiguous, rendering summary judgment inappropriate. While the court has no difficulty accepting the application of Michigan law to construction of the Franchise Agreement, the court does not believe that Michigan law renders the contract ambiguous.

Plaintiffs argue that the disputed language "settlement of accounts" can be "interpreted in two or more ways" and is thus patently ambiguous. (Defendant's Opposition, Docket #·65 at 8).[3] Plaintiffs state:

There can be several definitions as to what constitutes a settlement of accounts. Plaintiffs allege that the settlement of accounts refers to all assets, including the franchise agreement, that are transferred to another dealer. In the case at bar all these accounts were specifically dealt with in the Buy/Sell Agreement and the Memorandum of Understanding.

(Defendant's Opposition, Docket # 65 at 8) The court disagrees with plaintiffs' construction of the simple phrase at issue.

The Franchise Agreement states that:

Any ... claim by the Dealer (whether for damages, stay of action or otherwise) with respect to ... *the settlement of the accounts of the Dealer with the Company after termination or nonrenewal of this agreement* ... shall be appealed by the Dealer to the Policy Board.

(Franchise Agreement, Defendant's Appendix at 17 ¶ 18(b)) Under Michigan law, if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous. *Raska v. Farm Bureau Mutual Ins. Co. of Michigan*, 412 Mich. 355, 314 N.W.2d 440 (1982). The language in all contracts should be considered according to its plain

and ordinary meaning. The plain meaning of a word should not be perverted. *Harter Corp. v. Home Indemnity Co.*, 713 F.Supp. 231, 232 (W.D.Mich.1989); *Bowman v. Preferred Risk Mut. Ins. Co.*, 348 Mich. 531, 83 N.W.2d 434, 438 (1957) ("[C]ontracts must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity in their plain, ordinary, and popular sense.... An examination of the policy does not indicate the word 'use' is employed in any technical sense. Its customary meaning is indicated in Websters...."). Most recently the Michigan Supreme Court reasoned:

We conclude that when considered in its plain and easily understood sense, "sudden" is defined with a "temporal element that joins together conceptually the immediate and the unexpected. [*United States Fidelity & Guaranty Co. v.*] *Star Fire Coals, supra* [856 F.2d 31] at 34 [ (6th Cir.1988) ]. The common, everyday understanding of the term "sudden" is " 'happening, coming, made or done quickly, without warning or unexpectedly; abrupt.' " *FL Aerospace* [*v. Aetna Casualty & Surety Co.*] *supra* [897 F.2d 214] at 219. [ (6th Cir.1990) ]. "Accidental means "[o]ccurring unexpectedly and unintentionally; by chance." The American Heritage Dictionary: Second College ed., p. 72. We, therefore, reject the definition of "sudden and accidental" as set forth by the Michigan Court of Appeals in *Jonesville* [*Products, Inc. v. Transamerica Ins. Group*, 156 Mich.App. 508, 402 N.W.2d 46 (1986) ]. Thus, we find that the terms "sudden" and "accidental" used in the pollution-exclusion clause are unambiguous.

*Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 207–08, 476 N.W.2d 392, 397–98 (1991).

In light of this authority, the court believes the agreement's language, in the context of this commercial contract, is specific, well-

---

3. Under Michigan law, "a patent ambiguity exists if the uncertainty as to meaning "appears on the face of the instrument, and arises from the defective, obscure or insensible language used." *Matter of Estate of Kremlick*, 417 Mich. 237, 331 N.W.2d 228, 230 (1983). This must be the ambiguity asserted by plaintiff because latent ambiguity, on the other hand, arises only "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic or extraneous evidence creates the possibility of more than one meaning". *Id.*

recognized, and simply means what it says. Webster's defines "settlement" as:

1: the act or process of settling 2a: an act of bestowing or giving possession under legal sanction b: the sum, estate or income secured to one by such a settlement 3a: a place or region newly settled b: a small village 4: an institution providing various community services esp. to large city populations 5: an agreement composing differences

Webster's Ninth Collegiate Dictionary 1078 (1991) If one ignores the obviously inapplicable third and fourth proffered definitions, one meaning fairly leaps to mind, to wit: the resolution of disputes. This leads to the next question, what kind of dispute? The answer is a dispute as to "the accounts of the Dealer with the Company". Webster's defines "account" as:

1 *archaic:* RECKONING, COMPUTATION 2a: a record of debit and credit entries to cover transactions involving a particular item or a particular person or concern b: a statement of transactions during a fiscal period and the resulting balance 3a: a statement explaining one's conduct b: a statement or exposition of reasons, causes, or motives (no satisfactory ˘ of these phenomena) c: a reason for an action: BASIS (on that ˘ I must refuse) 4a: a formal business arrangement providing for regular dealings or services (as banking advertising or store credit) and involving the establishment and maintenance of an account; *also:* CLIENT, CUSTOMER b: money deposited in a bank account and subject to withdrawal by the depositor 5a: VALUE, IMPORTANCE (it's of no ˘ to me) b: ESTEEM (stood high in their ˘ ) 6: ADVANTAGE (turned her wit to good ˘ ) 7a: careful thought: CONSIDERATION (have to take many things into ˘ ) b: a us. mental record: TRACK (keep ˘ of all you do) 8: a description of facts, conditions, or events: REPORT, NARRATIVE (the newspaper ˘ of the fire) (by all ˘ s they're well off) *also:* PERFORMANCE (a straightforward ˘ of the sonata)—on account: with the price charged to one's account—on account of: for the sake of: by reason of:

because of—on no account: under no circumstances—on one's own account 1: on one's own behalf 2: at one's own risk 3: by oneself: on one's own

Webster's Ninth Collegiate Dictionary 50 (1991) In the context of this contract, the term "account" then, admits to meaning either a record of debit or credit entries to cover a transaction involving a particular item or concern, or a formal business arrangement providing for regular dealings or services and involving the establishment or maintenance of an account—fairly indistinguishable meanings which are precisely our concern here. Plaintiff here claims that his DWE submissions for warranty work, made pursuant to the terms of his franchise agreement, were routinely undervalued by Ford. To charge that this claim is not one involving the resolution of a dispute involving the credit or debit entries to cover transactions involving a particular concern ignores, it is believed, the obvious. The contract, it is believed, has but one interpretation—the defendant's.

The court believes plaintiffs' reasoning has been rejected by Michigan courts. In effect, plaintiffs argue: I can interpret the contract in more than one way and since I can make such an argument it must, under Michigan's rules of construction, be construed in the manner I suggest. Michigan courts have rejected such an approach. *See, e.g., Lincoln Mutual Casualty Co. v. American Arbitration Assoc.,* 49 Mich.App. 676, 212 N.W.2d 765, 767 (1973) ("Mere assertion of ambiguity does not establish ambiguity; it arises, if at all, from the language claimed to be ambiguous. Absent ambiguity, the rights of the parties rest on the contract as written.") (citations omitted). Most recently, the majority of the Michigan Supreme Court addressed these very points in its critique of the dissent's reasoning:

Justice Levin ... relies heavily on an assertion of ambiguity buttressed by citation to the contract construction principle which construes ambiguous language in favor of the insured. The majority ... in response ... cites *Wozniak v. John Hancock Mutual Life Ins. Co.,* 288 Mich. 612, 615, 286 N.W. 99 (1939):

... This rule does not mean, however, that the plain meaning of plain words should be perverted, or that a word or phrase, the meaning of which is specific and well-recognized, should be given some alien construction merely for the purpose of benefitting the insured.

Justice Levin, in his dissent, attempts to support his assertion of ambiguity in two ways. First, he claims that the term "sudden" is ambiguous because it is defined in a variety of ways in the dictionary and is thus susceptible to more than one reasonable interpretation. The dissent cites *Just v. Land Reclamation Ltd.,* 155 Wis.2d 737, 456 N.W.2d 570 (1990) in support of this claim.... We reject the reasoning of the *Just* court. Most, if not all, words are defined in a variety of ways in each particular dictionary, as well as being defined differently in different dictionaries. Similarly, different dictionaries have different ways of listing and ordering the several definitions of each particular word. If courts followed the reasoning of the *Just* court, *it would be virtually impossible to write a contract that was unambiguous.* Moreover, the majority refuses to ascribe ambiguity to words in the English language simply because dictionary publishers are obliged to define words differently to avoid possible plagiarism. Therefore, we reject the temptation to rewrite the plain and unambiguous meaning of the policy under the guise of interpretation. Rather, we enforce the terms of the contract as written.

*Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 208 at note 8, 476 N.W.2d 392, 398 at note 8 (1991) (emphasis added). Plaintiffs were, therefore, bound to comply with this unambiguous term of the contract.

■ Our final question is whether plaintiffs did comply with the contract. By their own interrogatory admission, there is no genuine issue that they did not. *See* Defendant's Motion, Docket #46, Exhibit #1 at ¶11 ("Plaintiff did not file a protest with the Motor Vehicle Dealers Board of Ford' Dealer Policy Board.") As such, plaintiffs have failed, by the very terms of their contract with Ford, to fulfill a condition precedent to suit. The sixth count is therefore barred. *See, e.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326 (7th Cir.1987).

With this conclusion established, the court shall not address the remaining grounds for judgment proffered by the defendant.

### IV. Conclusion

There is no genuine issue that the Franchise Agreement between plaintiffs and defendant was terminated, and that the unambiguous terms of that agreement establish, as a condition precedent to suit, plaintiffs' utilization of mediation; an exercise they unquestionably failed to pursue. Accordingly, the defendant's motion for partial summary judgment as to count six of plaintiffs' complaint, Docket #46, is **GRANTED** in its entirety.

IT IS SO ORDERED.