AMERICAN STATES INSURANCE COMPANY, and Indiana Insurance Company, Plaintiff,

v.

MARYLAND CASUALTY CO., a Maryland Insurance Company; Liberty Mutual Insurance Company, a Massachusetts Insurance Company; Hartford Casualty Insurance Company, a Connecticut Insurance Company; Hartford Accident and Indemnity Company, a Connecticut Insurance Company; Michigan Mutual Insurance Company, a Michigan Insurance Company, and National Drum & Barrel Corporation, a Michigan Corporation, Jointly and Severally, Defendants.

Civ. A. No. 82–70353.

United States District Court,
E.D. Michigan, S.D.

July 3, 1984.

Sullivan, Ward & Bone by Gregory I. Thomas, Detroit, Mich., for plaintiff.

Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen by Robert S. Cubbin, Detroit, Mich., for defendant Maryland Cas.

Barbier, Goulet & Petersmarck, P.C. by Ralph W. Barbier, Jr., Susan J. Sadler, Mount Clemens, Mich., for defendant Liberty Mut.

Jenkins, Nystrom, Hitchcock & Nystrom by Jeannette A. Paskin, Southfield, Mich., for defendants Hartford Cas. Ins. Co. and Hartford Acc. and Indem. Co.

Joselyn, Rowe, Jamieson, Grinnan, Callahan & Hayes, P.C. by Edward V. Keelean, Detroit, Mich., for defendant Michigan Mut.

Gourwitz & Barr by Benson J. Barr, Bryan H. Levy, Southfield, Mich., for defendant National Drum & Barrel Corp.

## OPINION

GILMORE, District Judge.

This is a declaratory judgment action brought by American States Insurance Co. (American States) against its insured, National Drum and Barrel Corp. (National Drum), and National Drum's other insurance carriers, who had issued policies of insurance effective for various periods between 1966 and 1981. The primary issue is which, if any, of the insurance carriers owes National Drum a duty to defend and/or indemnify it in four underlying lawsuits filed in Wayne and Oakland Counties.

For the following reasons, the Court holds that none of the party insurance carriers has a duty to defend or indemnify National Drum.

I

All of the party insurance companies provided general liability coverage to National Drum at various times from July 1966 through November 1981. The individual insurers were on the risk during the following periods:

Liberty Mutual Insurance Co. (Liberty), July 1966 to October 1, 1972;

Hartford Casualty Insurance Co. (Hartford), October 1, 1972 to October 1, 1975;

Michigan Mutual Insurance Co. (Michigan Mutual), October 1, 1975 to October 1, 1976;

American States, October 1, 1976 to October 1, 1979;

Maryland Casualty Co. (Maryland Casualty), October 1, 1979 to October 20, 1981.

During the years 1979, 1981 and 1982, National Drum was named as a defendant in four separate lawsuits. These lawsuits will be referred to as the following:

*Gustinis,* filed in Oakland County on December 21, 1979;

*Kozar,* filed in Wayne County on January 28, 1981;

*Triple G. Land Co.,* filed in Wayne County on July 6, 1982;

*Neal-Ormond Venture,* filed in Wayne County on July 6, 1982.

The plaintiffs in these suits alleged generally that National Drum was liable for personal injury and/or property damage arising out of the dumping of toxic waste materials on certain properties located in Michigan, commencing in 1966 and continuing until the time of the filing of the complaints.

Pursuant to a reservation of rights agreement, American States retained counsel to appear and defend National Drum in the four lawsuits. American States also

advanced funds to settle three of the four lawsuits. American States has spent approximately $63,288.91 in defense costs to date. The *Gustinis* case was settled on behalf of National Drum for $5,000, and the *Triple G* and *Neal-Ormund* cases were settled together on National Drum's behalf for $1,500. It is plaintiff's contention that the settlement funds were advanced strictly on a cost of defense basis and thus should be considered as a part of the defense costs. The fourth suit, *Kozar*, was not settled at the time of trial of this matter, but plaintiff nevertheless contends that any funds advanced to settle that suit should likewise be considered as defense costs.

## II

In this declaratory judgment action, plaintiff claims that all of the party insurance companies have a duty to defend National Drum because the plaintiffs in the four suits advanced theories which arguably fall within the coverage of each policy.

Under Michigan law[1], it is well established that an insurer's duty to defend is independent of its duty to pay. *Stockdale v. Jamison*, 416 Mich. 217, 330 N.W.2d 389 (1982). The duty to defend depends entirely on whether the person claiming against the insured has advanced any theories of recovery in the complaint that even arguably fall within the coverage of the policy. *Guerdon Industries v. Fidelity & Casualty of New York*, 371 Mich. 12, 123 N.W.2d 143 (1963); *Wright v. White Birch Park*, 118 Mich.App. 639, 325 N.W.2d 524 (1982); *Detroit Edison v. Michigan Mutual*, 102 Mich.App. 136, 301 N.W.2d 832 (1980); *Dochod v. Central Mutual*, 81 Mich.App. 63, 264 N.W.2d 122 (1978).

In applying this principle of insurance law to this case, it is necessary to scrutinize the theories of liability advanced in each complaint, as well as the relevant provisions of each insurance policy.

The four lawsuits were filed within three years after a "toxic substance emergency" was declared for the entire area surrounding the dump sites. The emergency action was taken in September 1979 following an extensive investigation by the Department of Natural Resources (DNR) of the dump sites in question. Since the early and mid-1970's, the owners of the dump sites were under orders to clean them up and alleviate the ill effects from the toxic waste materials. Their failure to comply with the orders precipitated the DNR investigation in 1979.

The allegations against National Drum in the four complaints can be summarized as follows:

National Drum was an originator or producer of toxic wastes which were dumped on certain properties.

The dumping began in 1966 and was continuous, and the pollution and contamination will likely continue into the future.

The toxic wastes seeped into the ground and moved through the water tables to the adjoining lands of plaintiffs.

Plaintiffs' water source was contaminated and unfit for human or animal consumption.

Plaintiffs consumed the water, which is dangerous to their health, were deprived of a source of water on their property, were deprived of reasonable use and enjoyment of their property, and suffered depreciation of market value.

National Drum entered into agreements to unlawfully dispose of the toxic materials and is liable for the unlawful dumping under theories of negligence, negligent entrustment, nuisance, trespass, strict liability and products liability.

The policies issued by the four party insurers for various periods of time between 1970 and October 1981 contain substantially the same basic language with respect to the duty to defend and indemnify. The language reads as follows:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property

---

**1.** Jurisdiction over this case is based on diversity of citizenship, and Michigan law applies.

damage to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage ... even if any of the allegations of the suit are groundless, false or fraudulent....

When used in this policy ... .

"[O]ccurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in *bodily injury or property damage* neither expected nor intended from the standpoint of the *insured;*

The policies also contain a pollution exclusion clause, which reads:

It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

There are only two variations of these standard policy provisions. First, both Michigan Mutual and Maryland Casualty define "occurrence" in slightly different language. Rather than "occurrence" meaning an accident, including "injurious" exposure, "occurrence" means an accident, including "continuous or repeated" exposure. The second difference is that the Liberty. Mutual policy in effect from 1966 until October 1, 1970 did not contain the pollution exclusion clause.

### III

The Court must ascertain whether the allegations in the complaint even arguably state an "occurrence" within the meaning of the policy.

The term "occurrence" includes an "accident." Accident has often been defined by courts according to common usage. Black's Law Dictionary 14 (5th ed. 1979) defines accident as:

[A] fortuitous circumstance, event, or happening; an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens; an unusual, fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence; an unusual or unexpected result attending the operation or performance of a usual or necessary act or event; chance or contingency; fortune; mishap; some sudden and unexpected event taking place without expectation, upon the instant, rather than something which continues, progresses or develops; something happening by chance; something unforeseen, unexpected, unusual, extraordinary or phenomenal, taking place not according to the usual course of things or events, out of the range of ordinary calculations; that which exists or occurs abnormally, or an uncommon occurrence.

Liberty Mutual argues that, by virtue of the continuous, rather than sudden and unexpected, nature of the dumping activities alone, National Drum can be considered to have produced and disposed of toxic waste as a natural and usual part of its business, and thus could not be considered to have had an "occurrence" or "accident" within the meaning of the policy. It cites three cases in which the courts held that the emission of pollutants as a result of the natural process of the insured's business was not an "accident" covered by the insurance policy. *American Casualty Co. v. Minnesota Farm Bureau Services Co.,* 270 F.2d 686 (8th Cir.1959); *U.S. Fidelity and Guarantee Co. v. Briscoe,* 205 Okl. 618, 239 P.2d 754 (1951); *Clark v. London and Lancashire Indemnity Co. of America,* 21 Wis.2d 268, 124 N.W.2d 29 (1963).

The allegations in all four complaints state that National Drum and other defendants were originators of toxic waste which was illegally dumped for a continuous period of time. The dumping is alleged to have begun in 1966 and the pollution and contamination resulting from the illegal dumping activities is alleged to likely continue

into the future. It is not at all clear from the complaints precisely when and for how long National Drum produced the waste that was illegally dumped. However, subsequent discovery and testimony at trial have disclosed that the waste which originated from National Drum ended up at the dump sites during the period 1968 through 1970. While allegations as to National Drum's involvement in the illegal dumping are very general, and it is never expressly alleged that the dumping was a regular part of its business, it is significant that it is never even suggested that the dumping was unintended, unexpected, sudden or by accident.

■ Given the continuous nature of the alleged dumping by National Drum, and the absence of any suggestion that it was accidental, the Court must conclude that there is not even arguably policy coverage for the damages caused by National Drum, as alleged in the *Gustinis, Kozar, Triple G* and *Neal-Ormund Venture* lawsuits. Accordingly, none of the party insurance companies has a duty to defend National Drum, or indemnify it for any award of damages or settlement costs assessed against it in the state court suits.

This holding is reinforced by recent case law on the scope and meaning of the pollution exclusion clause in liability insurance policies such as the policies issued to National Drum after 1970. In *Lansco, Inc. v. Department of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520 (1975), the court interpreted the pollution exclusion clause to preclude coverage for damages caused by pollution, except where the "occurrence" causing the pollution is both "sudden and accidental," as those terms are commonly understood. The *Lansco* court imposed a duty to defend based on unique facts which are clearly distinguishable from those in the instant case. In *Lansco*, in an act of vandalism, an unknown person opened valves at the insured's business allowing gasoline to flow onto neighboring lands. Certainly this action can be said to be sudden and accidental as contrasted with the direct and allegedly continuous acts of National Drum in unlaw-

fully disposing, or contracting to dispose, of toxic waste.

In *Niagara County v. Utica Mutual Insurance Co.*, 439 N.Y.S.2d 538, 80 A.D.2d 415 (1981), an insurer of a defendant in the "Love Canal" litigation brought a declaratory judgment action to determine coverage under its policy which contained a pollution exclusion clause. The New York Court concluded that the policy behind the pollution exclusion clause was to prevent industries from seeking insurance coverage rather than stop polluting the environment. The court relied on 3 R. Long, The Law of Liability Insurance, App.–58 (1980), which stated the policy behind the pollution exclusion as follows:

> *Pollution:* exclusion (f) is new. It eliminates coverage for damages arising out of pollution or contamination, where such damages appear to be expected or intended on the part of the insured and hence are excluded by definition of 'occurrence.' Coverage is afforded for damages caused by pollution or contamination if the discharge, dispersal, release or escape is sudden and accidental.

*Id.* 439 N.Y.S.2d at 540.

As this quote suggests, the pollution exclusion clause was not intended to exclude coverage previously provided, but was intended to eliminate any doubt that may have existed concerning coverage for damages caused by the emission of pollutants as a regular or continuous part of the insured's business.

## IV

Based on the foregoing, the Court holds that none of the party insurers has a duty to defend and/or indemnify National Drum for damages it is alleged to have caused in the four underlying lawsuits. The policies of insurance in effect between 1966 and 1981 did not provide coverage for losses sustained as a result of non-accidental disposal of the insured's toxic waste. The allegations in the four complaints suggest that the release of toxic materials was continuous and not in any way sudden or accidental, and therefore do not even arguably

1554

state an "occurrence" which would require the insurers to defend and/or indemnify National Drum.