**Henry H. CLAUSSEN,**
**Plaintiff–Appellant,**

v.

**The AETNA CASUALTY & SURETY COMPANY, and Federal Insurance Company, Defendants–Appellees.**

**No. 87–8972.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1989.

David E. Hudson, Augusta, Ga., for plaintiff-appellant.

James A. Eichelberger, Linda B. Foster, Neely & Player, Atlanta, Ga., for defendants-appellees.

Thomas W. Tucker, Dye, Miller, Tucker & Everitt, P.A., Augusta, Ga., for Federal Ins. Co.

Laura Anne Foggan, Kirk J. Nahra, Thomas W. Brunner, Wiley, Rein & Fielding, Washington, D.C., amicus curiae.

William F. Greaney, Covington & Burling, Washington, D.C., amicus curiae.

Before RONEY, Chief Judge, HATCHETT, Circuit Judge, HENDERSON, Senior Circuit Judge.

PER CURIAM:

This suit sought a declaratory judgment that Aetna Casualty & Surety Company and Federal Insurance Company were obligated to provide Henry H. Claussen with a defense and coverage under Comprehensive General Liability (CGL) policies of insurance for the costs incurred and to be incurred in connection with the Environmental Protection Agency's (EPA) demand that Claussen and others conduct an investigation and prepare and implement a plan for eliminating environmental concerns created by the existence of hazardous waste materials on Claussen's Florida property.

Because this case involved the proper interpretation under Georgia law of the pollution exclusion clause contained in the CGL policy, and because similar provisions have received conflicting interpretations in other jurisdictions throughout the country, we certified the question of liability to the Supreme Court of Georgia pursuant to Ga. Const. art. VI, § 6 para. 4; Ga.Code Ann. § 15-2-9; and Rule 37 of the Supreme Court of Georgia. *Claussen v. Aetna Casualty & Sur. Co.*, 865 F.2d 1217 (11th Cir.1989).

The Supreme Court of Georgia has now answered the certified question and interpreted the contract in favor of the insured. *Claussen v. Aetna Casualty & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989). Since the district court had granted summary judgment for the insurer, we reverse and remand for further proceedings consistent with the Georgia law as set forth in the opinion of the Supreme Court of Georgia, attached hereto as an Appendix.

REVERSED AND REMANDED.

## APPENDIX

In the Supreme Court of Georgia

CLAUSSEN v. AETNA CASUALTY & SURETY COMPANY, et al.

46749.

Decided JUNE 22, 1989

CLARKE, Presiding Justice.

In this case we are called upon to interpret the meaning of the "pollution exclusion" clause of a comprehensive general liability insurance policy. For the reasons stated below, we hold that the insurance policy at issue does not preclude coverage for liability for environmental contamination caused by the discharge of pollutants over an extended period of time.

Briefly stated, the history of the case is as follows [1]: Since 1966, Henry Claussen has owned, either individually or through corporate entities, fifty-two acres of land known as Picketville. In 1968, the City of Jacksonville, Florida contracted to use the site as a landfill. Beginning in 1971, the City dumped industrial and chemical waste there almost exclusively. The City closed the site in 1977, and returned it to Claussen completely filled, graded and seeded. Claussen claims he had no knowledge that the site was used for dumping hazardous wastes.

In 1985, Environmental Protection Agency determined that the groundwater beneath the site had been contaminated by

---

[1]. A more complete version of the relevant facts may be found in *Claussen v. Aetna Casualty & Surety Co.*, 865 F.2d 1217 (11th Cir.1989); and *Claussen v. Aetna Casualty & Surety Co.*, 676 F.Supp. 1571 (S.D.Ga.1987).

the release of hazardous substances. In a list ranking the 115 worst hazardous waste sites in the nation, Love Canal was ranked twenty-fourth, and Picketville was ranked twenty-sixth. The agency informed Claussen, the City and others that they were responsible for taking corrective action.

Henry Claussen then filed an action against Aetna Casualty & Surety Company and others seeking a declaratory judgment that the insurance company is obligated under a "comprehensive general liability" policy for the costs to be incurred in connection with the EPA's demand that the hazardous site be studied and cleaned up. Aetna denied coverage citing exclusion (f), commonly referred to as the "pollution exclusion" which states that coverage is excluded for:

> ... bodily injury or property damage arising out of the discharge, dispersal, or release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental ...

The federal district court granted Aetna's motion for summary judgment, holding that the exclusion clause precludes coverage for Claussen's environmental liabilities. The court found the clause to be clear and unambiguous and decided that dumping of toxic wastes occurring over several years was not "sudden" within the policy language. Claussen appealed to the Eleventh Circuit Court of Appeals which certified the following question to this court:

> Whether, as a matter of law, the pollution exclusion clause contained in the comprehensive general liability insurance policy precludes coverage to its insured for liability for the environmental contamination caused by the discharge of pollutants at the site over an extended period of time?

To put it another way, does the insurance policy in this case require the insurance company to provide a defense and coverage to the insured for liability for the discharge of pollutants from a landfill over an extended period of time?

1. "The construction of a contract is a matter of law for the court." OCGA § 13-2-1. Extrinsic evidence to explain ambiguity in a contract becomes admissible only when a contract remains ambiguous after the pertinent rules of construction have been applied. *Holcomb v. Word,* 239 Ga. 847, 238 S.E.2d 915 (1977). Under Georgia rules of contract interpretation, words in a contract generally bear their usual and common meaning. OCGA § 13-2-2(2). However, "if the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." OCGA § 13-2-2(5). Georgia courts have long acknowledged that insurance policies are prepared and proposed by insurers. Thus, if an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured. *See,* e.g., *Richards v. Hanover Ins. Co.,* 250 Ga. 613, 299 S.E.2d 561 (1983); *Cincinnati Ins. Co. v. Davis,* 153 Ga.App. 291, 265 S.E.2d 102 (1980); *American Casualty Co. v. Callaway,* 75 Ga.App. 799, 44 S.E.2d 400 (1947); *Massachusetts Benefit Life Ass'n v. Robinson,* 104 Ga. 256, 30 S.E. 918 (1898). What is the meaning of the word "sudden" as it is used in the insurance policy? Claussen argues that it means "unexpected;" Aetna asserts that the only possible meaning is "abrupt." This seemingly simple question has spawned a profusion of litigation. The majority of courts considering the issue have adopted the meaning asserted by Claussen. *See* Developments—Toxic Waste Litigation, 99 Harv.Law Rev. 1458, 1582 (1986). *See also* cases cited in *Claussen v. Aetna Casualty & Surety Co.,* 865 F.2d 1217, 1218 (11th Cir.1989). Other courts have decided that "sudden" cannot be defined without its temporal connotation. *See,* e.g. *Claussen v. Aetna Casualty & Surety Co.,*

676 F.Supp 1571 (S.D.Ga.1987), and cases cited therein.

The primary dictionary definition of the word is "happening without previous notice or with very brief notice; coming or occurring unexpectedly; not foreseen or prepared for." Webster's Third New International Dictionary, at 2284 (1986). *See also*, Funk and Wagnalls Standard Dictionary, at 808 (1980); Black's Law Dictionary, at 1284 (1979). The definition of the word "sudden" as "abrupt" is also recognized in several dictionaries and is common in the vernacular.[2] Perhaps, the secondary meaning is so common in the vernacular that it is, indeed, difficult to think of "sudden" without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. But, on reflection one realizes that, even in its popular usage, "sudden" does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, it's spring. *See also*, Oxford English Dictionary, at 96 (1933) (giving usage examples dating back to 1340, e.g. "She heard a sudden step behind her"; and, "A sudden little river crossed my path As unexpected as a serpent comes.") Thus, it appears that "sudden" has more than one reasonable meaning. And, under the pertinent rule of construction the meaning favoring the insured must be applied, that is, "unexpected."

2. Aetna next argues that construing "sudden" to mean "unexpected" violates another pertinent rule of construction, which requires that the contract be read so as to give all parts meaning. The policy states:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage to which this policy applies, caused by an occurrence ...

The policy goes on to define "occurrence" as "property damage neither expected nor intended from the standpoint of the insured." Aetna contends that if "sudden" is interpreted as "unexpected," it simply restates the definition of "occurrence." We do not agree. The pollution exclusion clause focuses on whether the *"discharge, dispersal or release"* of the pollutants is unexpected and unintended; the definition of occurrence focuses on whether the *property damage* is unexpected and unintended. The pollution exclusion clause therefore has the effect of eliminating coverage for damage resulting from the intentional discharge of pollutants.[3]

3. Aetna also argues that the construction proposed by Claussen violates the cardinal rule of contract interpretation because it is inconsistent with the intention of the parties. They assert that pollution liability is an enormous risk that was not assessed in the process of underwriting this policy.

Sixteen years ago when the policy at issue here went into effect, it is unlikely that either party anticipated the extent of potential liability for pollution damage.[4] "The past two decades have seen an explosion of litigation seeking compensation for damage to the environment and injuries

---

**2.** "Abrupt" does not appear in the Webster's Third New International Dictionary as a definition of "sudden."

**3.** Other Courts have denied coverage under the policy to insureds that actively disposed of toxic or radioactive wastes in the regular course of business activity. *See,* e.g., *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987); *American States Ins. Co. v. Maryland Casualty Co.,* 587 F.Supp. 1549 (E.D.Mich. 1984); *City of Milwaukee v. Allied Smelting Corp.,* 117 Wis.2d 377, 344 N.W.2d 523 (Ct.App. 1983).

**4.** Documents in the record indicate that in 1970 Aetna considered environmental pollution to be a major societal problem. Drafting the pollution exclusion was certainly part of an effort to control the company's exposure to loss arising out of pollution. At that time, however, the company could not have anticipated the imposition of no-fault environmental liability. The company's emphasis was "to avoid writing any accounts ... where there is wanton pollution with complete disregard for the public ..." *See* Appendix C–12 to Appellant's brief.

arising from environmental pollution." Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Geo.L.J. 1237 (1986). Moreover, the Federal Superfund Act,[5] passed in 1980, imposed "retroactive strict liability" for the costs of cleaning up hazardous waste storage sites on the generators and transporters of hazardous wastes and on the owners and operators of the sites. Abraham, *Environmental Liability and the Limits of Insurance*, 88 Colum.L.Rev. 942, 957 (1988). Referring to the decade before CERCLA passed, one commentator noted:

> In the past, insurance was available at prices that did not reflect the full environmental risks of each insured firm. Insurers had little incentive to tailor premiums closely to an individual firm's risk profile, because such tailoring requires the expense of monitoring each firm and because insurers did not expect courts to impose significant waste-related liabilities.

*Developments—Toxic Waste Litigation*, 99 Harv.L.Rev. 1458, 1575 (1986). If Aetna had been aware of the yawning extent of potential liability, it almost certainly would have drafted its policy differently. However, the fact that it did not, cannot be construed to the detriment of the insured who purchased a "comprehensive general liability" policy. Under Georgia law, the risk of any lack of clarity or ambiguity in an insurance contract must be borne by the insurer. *Rangers Ins. Co. v. Culberson*, 454 F.2d 857 (5th Cir.1971), *cert. denied* 407 U.S. 916, 92 S.Ct. 2440, 32 L.Ed.2d 691 (1972).

Further, the interpretation of the policy advanced by Claussen is not contrary to the interpretation Aetna gave the clause when it was adopted. Documents presented by the Insurance Rating Board (which represents the industry and on which Aetna participated) to the Insurance Commissioner when the "pollution exclusion" was first adopted suggest that the clause was intended to exclude only intentional polluters. The Insurance Rating Board represented "the impact of the [pollution exclusion clause] on the vast majority of risks would be no change." *See, Claussen*, 676 F.Supp at 1573.

4. Finally, Aetna argues that Claussen's proposed interpretation of the policy language contravenes public policy because it encourages the land owner to keep his head in the sand—to remain oblivious to ongoing polluting activities on his land. This argument would be somewhat persuasive, but for the many events that have taken place between the date of this policy and the present lawsuit. "Environmental liability insurance has recently undergone a shift from apparent under-deterrence to apparent over-deterrence of environmental damages." *Developments* 99 Harv.L.Rev. 1458, 1574 (1986). Federal and state laws now require waste treatment facilities to carry insurance for both short and long term environmental risks or to meet a financial test alternative. *See, Georgia Department of Natural Resources Environmental Protection Division v. Union Timber Corporation*, 258 Ga. 873, 375 S.E.2d 856 (1989). Insurance companies have become wary of insuring against environmental risks and have either dropped out of the field or are charging higher premiums. *Id.* In short, the situation has changed so that our decision is not likely to have any serious impact on prospective behavior.

In sum, we conclude that the pollution exclusion clause is capable of more than one reasonable interpretation. The clause must therefore be construed in favor of the insured to mean "unexpected and unintended."

*Question answered. All the Justices concur, except Marshall, C.J., Bell and Hunt, J.J., who dissent.*

HUNT, Justice, dissenting.

I respectfully dissent because in my view the Federal District Court was correct in finding the "pollution exclusion" clear and unambiguous. While "sudden" may have a

---

5. *See,* Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767 (codified as amended in scattered sections of 26 U.S.C., 33 U.S.C. 42 U.S.C. and 49 U.S.C.)

number of meanings, and, over the years, may have been used in a number of contexts, in *this* context it clearly means abrupt and unexpected. Certainly, its use within this context does not encompass the gradual dumping of toxic wastes over a period of several years.

I am authorized to state that Chief Justice MARSHALL and Justice BELL join in this dissent.