United States Court of Appeals,

Eleventh Circuit.

No. 94-8452.

VIRGINIA PROPERTIES, INC., Plaintiff-Appellant,

v.

HOME INSURANCE COMPANY, et al., Defendants-Appellees.

Feb. 12, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:92-CV-779-JTC), Jack T. Camp, District Judge.

Before TJOFLAT, Chief Judge, BARKETT, Circuit Judge, and CLARK, Senior Circuit Judge.

TJOFLAT, Chief Judge:

Plaintiff Virginia Properties, Inc. ("VPI"), owner of a wood treatment facility in Henrico County, Virginia, has incurred substantial expenses pursuant to clean-up orders issued by the Environmental Protection Agency (the "EPA," or the "Agency"). VPI brought this diversity action against its insurers (seven insurance companies, all of whom had issued comprehensive general liability policies to VPI), seeking coverage of those expenses. The district court granted summary judgment for the defendants on the basis of a pollution exclusion clause included in the policies.[1] VPI appeals that grant of summary judgment. We affirm.[2]

---

[1] Three of the defendant insurers were dismissed prior to the entry of summary judgment. The court granted summary judgment in favor of the remaining four, who are the appellees before us: The Home Indemnity Company, The Hartford Insurance Company, Chicago Insurance Company, and Fireman's Fund Insurance Company.

[2] In 1994 this court affirmed, without opinion, a district court's grant of summary judgment in a case virtually identical to the present one. *See Damar, Inc. v. United States Fire Ins.,* 856 F.Supp. 679 (N.D.Ga.1993), *aff'd,* 21 F.3d 1126 (11th

I.

This appeal presents the oft-litigated question of whether clean-up costs incurred pursuant to EPA order fall within the scope of a comprehensive general liability contract.

Between 1971 and 1986, virtually all insurance companies issued identically worded comprehensive general liability ("CGL") insurance contracts drafted by the National Bureau of Casualty Underwriters and the Mutual Insurance Rating Bureau. *See Broderick Investment Co. v. Hartford Accident & Indemnity Co.,* 954 F.2d 601, 603 n. 1 (10th Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 189, 121 L.Ed.2d 133 (1992). The contracts always included a "pollution exclusion clause" that typically eliminated coverage for damages arising out of the discharge of pollutants into the air, water, or land, except when the discharge was "sudden and accidental." *See* 7A John A. Appleman, *Insurance Law & Practice* §§ 4524-4525 (Berdal ed. 1994).

Well after the standard form for CGL policies was drafted, Congress enacted a statutory scheme that retroactively imposed strict liability for pollution cleanup. *See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1197 (1st

---

Cir.1994). Ordinarily, the ruling of a prior panel controls any subsequent panel's disposition of the same question of law. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) ("[A] prior decision of the circuit (panel or en banc) [cannot] be overruled by a panel but only by the court sitting en banc."); *United States v. Machado,* 804 F.2d 1537, 1543 (11th Cir.1986) ("Only a decision by this court sitting en banc or by the United States Supreme Court can overrule a prior panel decision."). However, the *Damar* panel affirmed without opinion, pursuant to Rule 36-1, which expressly provides that such an opinion will have "no precedential value." *See* 11th Cir.R. 36-1.

Cir.1994); Appleman, *supra,* § 4520. The major components of this scheme are the Resource Conservation and Recovery Act of 1976 (the "RCRA"), and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (the "CERCLA," also known as the "Superfund Act"). *See* 42 U.S.C. § 6901 *et seq.* (RCRA); 42 U.S.C. § 9601 *et seq.* (CERCLA). Together these statutes provide a comprehensive framework for the production, transportation, storage, disposal, and clean-up of hazardous wastes. CERCLA is the more significant of the two with respect to establishing cleanup liability; it essentially permits the government "to order a responsible party to clean up the polluted site, or to clean up a site itself and obtain reimbursement from the responsible party." Appleman, *supra,* § 4520. "It also makes the responsible party liable for damages to the environment, and for costs such as litigation expenses and attorneys fees." *Id.*

CERCLA has imposed tremendous clean-up costs on polluters, who have, quite naturally, turned to their insurers for coverage of those costs under their CGL policies. Not surprisingly, insurers have consistently contested these attempts. *See* Appleman, *supra,* § 4520. In recent years, CGL policies—and pollution exclusion clauses in particular—have engendered considerable litigation between insurance companies and policyholders.[3]

The construction of insurance contracts is a question of state law. There have been countless cases in state courts and federal

---

[3]*See* Appleman, *supra,* § 4520 n. 1 ("[I]n 1991 an estimated 2,000 coverage cases were pending, and it is estimated that the insurance industry will ultimately pay from $30-$300 billion in legal fees in defending coverage actions.").

court, and, to date, no obvious "majority" or "minority" views have emerged. In some cases, the battle has been waged over whether clean-up costs are actually covered by the terms of a CGL policy. That is, the typical policy provides that the insurer will pay, on behalf of the insured, all "sums" the insured becomes "legally obligated to pay as damages." Courts have divided over whether clean-up costs imposed by the EPA are, indeed, such "sums." *Compare Atlantic Wood Indus. Inc. v. Lumberman's Underwriting Alliance,* 196 Ga.App. 503, 396 S.E.2d 541 (1990), *cert. denied,* 498 U.S. 1085, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1991) (EPA-mandated pollution clean-up costs constitute "damages" within the coverage of a CGL policy) (Georgia law) *with A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 F.2d 66 (1st Cir.1991) (administrative and clean-up costs are equitable in nature and do not constitute "damages" with meaning of CGL policy) (Maine law). In many cases, litigants have disputed the breadth of the "sudden and accidental discharge" exception to the pollution exclusion. Courts have divided nearly evenly on the meaning of "sudden." Nearly half have found the word ambiguous and, construing the ambiguity against the drafter, have interpreted the word to mean "unexpected" rather than "temporally abrupt." *Compare Waste Management v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986) ("sudden" means "instantaneously or precipitously") (North Carolina law) *with Broderick Inv. Co. v. Hartford,* 954 F.2d 601 (10th Cir.1992) ("sudden and accidental" means "unexpected and unintended") (Colorado law). In still other cases, including this one, the battle has been waged over other provisions of the CGL policy.

II.

The property at the center of this dispute is a wood treatment facility in Virginia. The facility, owned by the VPI, operated from 1957 until 1990.[4] Over this thirty-year period, VPI worked with a variety of chemicals, including chromium zinc arsenate (CZA), pentachlorophenol (PCP), chromium copper arsenate (CCA), creosote, and xylene. Most of the chemicals used have now been designated as "hazardous substances" by the EPA, pursuant to the RCRA, *see* 42 U.S.C. § 6921, and are subject to regulation pursuant to CERCLA and RCRA.

VPI used an unlined twenty-five foot by twenty-five foot pit in the ground for run-off from the wood treatment process. (A lining might have prevented chemicals from seeping into the soil and groundwater.) Treated wood was also allowed to drip onto the soil. No precautions were taken to prevent rainwater from contacting this soil and then flowing off the premises. Chemical agents eventually caused severe soil and groundwater contamination on the premises. Contaminated water also drained into a nearby stream off the premises.

In 1980, VPI filed a Hazardous Waste Permit Application with the EPA, and in 1982, it filed a Notice of Hazardous Waste Activity with the Agency. As a result of subsequent investigations, in 1987 the EPA proposed listing the Henrico County facility on the "National Priorities List" of hazardous waste sites. (Placing a

---

[4]The original owner, the Virginia Wood Preserving Corporation, subsequently merged with another corporation and formed Rentokil, Inc., which eventually changed its name to Virginia Properties, Inc.

site on this list entitles the EPA to order parties responsible to take remedial measures. *See* 42 U.S.C. § 9605.) In December of 1987, VPI and the EPA executed a consent order in which they agreed to develop ways of addressing the clean-up problem. The site was then placed on the National Priorities List in 1989. VPI and the EPA entered into another consent order in March 1992, this time for repair and containment of the environmental damage. In June 1993, the EPA made a formal demand for reimbursement of costs incurred for its response activities.

The appellee insurance companies had issued a variety of comprehensive general liability policies to VPI.[5] VPI initiated this action in 1992, seeking to require its insurers to provide a defense to the proceedings before the EPA (which had culminated in the consent orders described above) and to pay the costs of clean-up. The insurance companies contested coverage on numerous grounds, among them that plaintiff failed to provide timely notice, that CERCLA-mandated remedial response costs are not "damages" within the meaning of a comprehensive general liability policy, and that coverage was precluded by a pollution exclusion clause. The district court granted summary judgment for all four defendants solely on the strength of the pollution exclusion clause.[6]

---

[5]Hartford issued primary liability policies for 1977-78, 1978-79, 1979-80, and 1980-81; Home Indemnity issued primary liability policies for 1981-82 and 1982-83; Chicago issued excess coverage policies for 1983-84 and 1984-85; and Fireman's Fund issued excess coverage policies for 1982-83, 1983-84, 1984-85, and 1985-86.

[6]Appellee Hartford contended that South Carolina and Virginia law applied to the policies it had issued; the remaining defendants agreed with the plaintiff that Georgia law applied to the policies they had issued. The district court

## III.

Each policy contained a standard pollution exclusion clause,[7] pursuant to which insurance would not apply:

> [t]o bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(Emphasis added.) The evidence was overwhelming that VPI intentionally discharged hazardous chemicals onto and into the soil, over a long period of time, as a byproduct of its ordinary operations. Indeed, VPI does not dispute this[8]. VPI concedes that there is no coverage under the CGL policies in this case, unless the "discharge, dispersal, release or escape" was "sudden and accidental." VPI characterizes the dispute as "whether the qualifying language means that the exclusion will not apply only if the *discharge* was unintended or that the exclusion will also not apply if the *damage from the discharge* was unintended." That is, VPI argues that it intended the discharge but not the damage from the discharge, and that the pollution exclusion clause does not

---

granted summary judgment for all four defendants without deciding the choice of law question. For the purposes of this appeal, Hartford acknowledges that Georgia law is applicable.

[7]The primary liability insurance policies contained the clause. Excess coverage policies were "follow form" policies, meaning that any exclusions in the primary policy would be read into the excess coverage policies.

[8]VPI argues on appeal that a few purely accidental spills occurred during this thirty-year period. However, it concedes that there would be no way to distinguish the damage caused by these few accidental spills from the overwhelming damage caused by the facility's long-term and routine practices.

apply in such a situation.

The Georgia Supreme Court has definitively construed the "sudden and accidental" portion of the pollution exclusion clause to mean "unexpected and unintended." *See Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686, 688 (1989).[9] The remainder of the clause is quite clear. The policies issued by Home Indemnity, Hartford, Chicago, and Fireman's Fund thus do not extend to property damage arising out of the discharge of toxic chemicals, unless the discharge was unexpected and unintended. As the Georgia Supreme Court has noted, "the pollution exclusion clause therefore has the effect of *eliminating coverage for damage resulting from the intentional discharge of pollutants.*" 380 S.E.2d at 688-89. If the terms of an insurance contract are plain and unambiguous, the contract must be enforced as written (provided it does not contravene the law). *Ryan v. State Farm Mut. Auto. Ins. Co.,* 261 Ga. 869, 413 S.E.2d 705 (1992). Accordingly, pursuant to the plain language of its comprehensive general liability insurance policies, plaintiff is precluded from recovering defense and indemnification costs from any of the defendant insurance companies.

The judgment of the district court is AFFIRMED.

---

[9]In *Claussen,* the insured had discharged pollutants over an extended period of time. The Georgia Supreme Court ruled that the word "sudden" in a pollution exclusion clause is capable of two meanings—either (1) temporally abrupt, or (2) unexpected. Construing the ambiguity against the drafter (the insurance company), the court held that "sudden and accidental" means "unexpected and unintended" and that, accordingly, the exception to the clause was triggered. *Claussen,* 259 Ga. 333, 380 S.E.2d 686 (1989). VPI would have us misread *Claussen* as standing for the proposition that the entire pollution exclusion clause is ambiguous.