**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

April 14, 2015

# In the Court of Appeals of Georgia

A14A1520. AYERS v. ASSOC. OF COUNTY COMMISSIONERS OF GEORGIA-INTERLOCAL RISK MANAGEMENT AGENCY.

BARNES, Presiding Judge.

This appeal addresses the trial court's order in a declaratory judgment as to coverage in a case involving the shooting death of a victim by a deputy sheriff. The trial court determined that liability coverage was limited to $1 million contained in an insurance policy issued to one of three counties that participated in a drug task force initially funded by a grant from the federal government. The plaintiff appeals this order. For the reasons that follow, we reverse.

Jonathan Paul Ayers was shot and killed by Billy Shane Harrison, who was a Stephens County deputy working for the Mountain Judicial Circuit Narcotics Criminal Investigation and Suppression Team ("the NCIS Team"), which covered Stephens County, Habersham County, and Rabun County. In her capacity as Ayers' surviving spouse and the administratrix of his estate, Abigail Marilyn Ayers sued

Harrison and others in federal court under 42 U.S.C. §1983, but after the United States Court of Appeals for the Eleventh Circuit reversed in part and affirmed in part the district court's order on the parties' motions for summary judgment, the only claims remaining were §1983 excessive force claims and state assault, battery, and false arrest claims against Harrison. *Ayers v. Harrison*, 506 Fed. Appx. 883, 885 (11th Cir. 2013).

In its opinion, the Eleventh Circuit Court of Appeals summarized the facts then in the record as follows:

> Viewed in the light most favorable to Plaintiff [Ayers], the record reveals the following facts. Although Officer Harrison concededly did not have probable cause to arrest Ayers at the time, Officer Harrison, while in plain clothes as an undercover officer, approached Ayers's car at a gas station to investigate possible drug activity. Only Ayers, as the driver, was in the car. Taking together Ayers's dying declaration and eyewitness testimony, Officer Harrison did not identify himself to Ayers as a police officer, but drew his gun, either waved the gun at Ayers or tapped the gun on the car window, and told Ayers to get out of the car. Thinking that he was being robbed, Ayers attempted to drive out of the gas station, but Officer Harrison fired two shots at Ayers's car. The second bullet pierced the windshield and struck Ayers in the abdomen, and he died shortly thereafter from the gunshot wound.

*Ayers,* 506 Fed. Appx. at 884.

2

The Association of County Commissioners of Georgia-Interlocal Risk Management Agency ("IRMA"), which had issued insurance policies to all three counties, defended Harrison in federal court under a reservation of rights letter which stated that the anticipated defense costs plus the requested damages may exceed its liability coverage of $1 million in the Stephens County policy.

After the Eleventh Circuit issued its opinion on the parties' summary judgment motions in February 2013, IRMA filed a petition for declaratory judgment against Harrison and Ayers in the Superior Court of Banks County in May 2013. IRMA asserted that it had been providing a defense for Harrison under the Stephens County policy under a reservation of rights, and further asserted that Ayers had contended that Harrison is also covered under insurance policies issued to Habersham and Rabun Counties and that the limits of all three policies may be stacked. IRMA thus sought a declaration that its maximum potential liability to indemnify Harrison in the civil rights suit was $1 million under the Stephens County policy, that Harrison was not covered under either the Habersham or the Rabun County policies, and that those policies could not be stacked to provide an additional $3 million in coverage.[1]

---

[1]Rabun County's liability coverage is limited to $2 million, and Habersham County's is $1 million.

Ayers removed the declaratory judgment to the Northern District of Georgia, but the district court granted IRMA's motion to remand the case to the superior court, finding that Ayers had failed to show federal jurisdiction over the matter. *Assoc. County Commn. of Ga.-Interlocal Risk Mgmt. Agency v. Harrison*, Civil Action No. 2:13-CV-00107-RWS (N.D. Ga., June 27, 2013).

Following discovery, the parties filed cross-motions for summary judgment. IRMA argued that its potential exposure should be capped at the limits of the liability policy issued to Stephens County because (1) Harrison was not covered under the Rabun County or Habersham County policies, and (2) even if he were covered, the policies contain anti-stacking provisions. Ayers argued that IRMA sought an improper advisory opinion because it had already denied coverage to the deputy under its Habersham and Rabun County policies and its duty to indemnify Harrison had not yet arisen absent a final judgment on Ayers' claim. She also argued that Harrison was covered under all three policies and that they do not contain anti-stacking provisions.

The trial court denied Ayers' motion for summary judgment and granted IRMA's motion, first finding that IRMA's reservation of rights letter was adequate to show its uncertainty as to whether the policies could be stacked, and thus IRMA's

4

petition for declaratory judgment stated a claim. The court continued, "Turning to the question of coverage, the Court finds that, for all of the reasons set forth by [IRMA, its] total liability in the underlying case cannot exceed the $1 million limit of the Stephens County Policy."[2]

Ayers contends on appeal that the trial court erred in granting summary judgment to IRMA and denying summary judgment to her, arguing that each county's policy "simultaneously and collectively provide coverage for the underlying occurrence." She asserts that (1) Harrison was insured under each policy because he was acting on behalf of all three counties, under the supervision of the NCIS Team Commander, when the shooting occurred, and that (2) the policies do not contain anti-stacking language.

"On appeal from the grant of summary judgment this [c]ourt conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the

---

[2]The underlying federal case was tried in early 2014, and the jury returned a damages verdict in Ayers' favor of $2,305,352, which the district court affirmed after post-trial motions. *Ayers v. Harrison*, Civil Action No. 2:10-CV-0032-RWS (N. D. Ga., April 23, 2014). The district court subsequently granted $710,998 in attorney fees and $121,202 in expenses to Ayers. *Ayers v. Harrison*, Civil Action No. 2:10-CV-0032-RWS (N. D. Ga., June 13, 2014).

nonmoving party, warrant judgment as a matter of law." (Citation omitted.) *Donovan v. State Farm Mut. Auto. Ins. Co.*, 329 Ga. App. 609, 610 (765 SE2d 755) (2014).

So viewed, the record shows that the NCIS task force was created by a Memo of Intergovernmental and Intra-agency Agreement for Grant Year 2009-2010 that was signed by the sheriffs of Habersham, Rabun, and Stephens County, the district attorney for the Mountain Judicial Circuit, and the police chiefs of 12 municipalities within the counties. The Stephens County Sheriff's Office had previously been a member of a different task force, but Stephens County Sheriff Randy Shirley, who was elected to begin serving office in January 2009, withdrew from that task force and decided to join a task force to which the sheriffs of Rabun and Habersham Counties belonged. The task force was renamed the NCIS Team in the 2009 Agreement, in which the governing bodies of the counties and municipalities authorized the Habersham County Commissioner's office to apply for and receive federal funding to "implement[] and provide[] the resources necessary to facilitate the investigation, arrest, prosecution and conviction of drug and violent crime offenders whose illicit activity impacts the collective jurisdictions." Habersham and Rabun Counties agreed to be "the implementing agencies . . . responsib[le] for assuring compliance with [the grant] program regulations and applicable local, state, and

6

federal laws." The implementing agencies also agreed "to provide proof that all employees maintain full liability coverage when conducting law enforcement activities outside the boundaries of the employees' respective agencies."

The Agreement provided that all of the NCIS Team's "operational and management policies shall be established and unanimously approved by a control group comprised of the primary executive officer of each participating agency," including "bylaws governing the conduct of its routine oversight responsibilities" and Standard Operating Procedures governing the activities of the Team. All personnel assigned to the team were required to meet or exceed certain minimal qualifications, training, and experience, and applicants would be disqualified for various reasons including drug use or certain prior convictions. The Agreement further provided that the signatories concurred with "the NCIS Team Strategic Plan attached to this 2009-2010 ... Grant ... Program," but no such plan is included in this record.

Finally, the Agreement set forth the NCIS Team budget for the 2009-2010 grant year. The budget indicates that each county and the City of Cornelia would each hire an agent and specified the annual salary each agent would receive. Each "hiring agency" was to budget 100 percent of its agent's salary but would be reimbursed for a portion of that salary from the federal grant. The Agreement also provided that each

7

of the three counties would pay a portion of the NCIS Team Commander and Secretary's salaries, and would be reimbursed at least in part by federal funds under a specific formula and order. All of the Team's operational expenses were to be paid from seized condemned funds, which were to be placed in the Team's Master Fund; each county would be apportioned funds to reimburse its "cash match requirement," but any remaining balance would be used by the Team "for continued drug and violent crime control initiatives" rather than used by the counties to supplement their local funding for law enforcement activities.

The NCIS Team received the federal grant of $291,000, and in May 2009 the Control Board, which consisted of the three county sheriffs, and the district attorney for the Mountain Judicial Circuit hired Kyle Bryant to serve as the NCIS Commander. Bryant was paid with federal grant money that passed to him through the host agency, Habersham County, and he reported to the Control Board, more specifically to the chair of the Board, who was Rabun County Sheriff Frank Andrews, Jr. In 2009 the NCIS Team was comprised of five officers in addition to Bryant: one from the National Guard's Counter-Drug Task Force who did not report directly to Bryant, one from each of the three counties and one from the City of Cornelia, the four of whom did report directly to Bryant.

Habersham County Sheriff Joseph Terrell testified that he, the Rabun County sheriff, and the district attorney decided to hire Commander Bryant, who was responsible for the day-to-day operations of the NCIS Team. Once an agent was hired by a county and assigned to the Team, that agent was detailed exclusively to the Team and was subject to Commander Bryant's oversight rather than to the oversight of the county sheriff's department that hired him.

In July 2010, Stephens County hired Harrison to be its agent assigned to the NCIS Team. Although Harrison was technically an employee of and paid by Stephens County, once hired, Harrison "immediately went under the auspices of the NCIS unit and their policies and procedures" and was "totally" under the control, direction, and supervision of NCIS Team Commander Bryant. Bryant issued Harrison his handgun and a shotgun. While each sheriff's deputy acquired state-wide arrest powers when sworn in by the county sheriff's office that hired him, as a courtesy the NCIS Team agents were also sworn in by the other two counties that were NCIS Team members. Accordingly, Harrison was sworn in as a deputy in Habersham and Rabun Counties in addition to Stephens County.

On the day of the shooting, Harrison was working undercover with another NCIS Team member, Ronnie Cronic, when they saw a drug dealer who had sold some

9

cocaine to a third agent lean into Ayers' car, and saw Ayers give the dealer some money. Harrison found the exchange notable because the dealer had told the third agent, Chance Oxner, that she was going to meet someone else to obtain more cocaine.[3] Cronic and Harrison retrieved Oxner from the Relax Inn, where he had executed the undercover buy, and Cronic, Harrison, Oxner, and a fourth agent met Commander Bryant in the courthouse parking lot. Harrison and Oxner got into Commander's Bryant's undercover Escalade to return to surveilling the motel, but after they passed the motel and turned around, Harrison realized that Ayers happened to be in front of them.

The agents watched Ayers pull into a convenience store and Bryant pulled the Escalade into a pawn shop parking lot across the street and turned to face the convenience store. When Ayers came out of the store and went to his car, Harrison told the others that he needed to go talk to Ayers to find out how he was involved with the drug dealer. Bryant pulled the Escalade into the convenience store parking lot and Harrison got out and approached Ayers, who put his car in reverse and backed

_____

[3]Oxner had been hired by and assigned to the Team by the Habersham County sheriff.

up quickly. Harrison fired his weapon twice into the car. Ayers drove out of the parking lot but was mortally wounded and died four hours later.

1. Under the rules of contract interpretation, courts must attempt to give meaning to all provisions of the contract and look to "the whole contract … in arriving at the construction of any part." OCGA § 13-2-2 (4); see *Horwitz v. Weil*, 275 Ga. 467, 468 (569 SE2d 515) (2002). "Although an ambiguous insurance contract must be construed in favor of the insured, a court may not strain to find an ambiguity and must enforce an unambiguous contract as written." *Thornton v. Ga. Farm Bureau Mut. Ins. Co.*, 287 Ga. 379, 384 (2) (b) (695 SE2d 642) (2010). When construing a contract, "[w]ords generally bear their usual and common signification." OCGA § 13-2-2 (2).

The three IRMA policies at issue here contain the same language, differing only in their limits of liability for law enforcement activities and deductible amounts. Each policy identifies the "Named Member" as the county itself, and "[a]ny official trustee, director, officer, or employee of the Named Member while acting within the scope of his or her duties as such [and] any [authorized] volunteer acting for or on behalf of the Named Member[.]" Under the Law Enforcement Liability section of all three policies, IRMA agreed

to pay on behalf of the Member all sums which the Member shall be obligated to pay as Money Damages by reason of liability imposed upon the Member by law or assumed by the Member under a Covered Contract, by reason of Personal Injury, Bodily Injury or Property Damage that is caused by *an Occurrence* as defined in this section.

(Emphasis supplied.) The policies define "Occurrence" as "an accident or a happening or event . . . that results from the conduct of *Law Enforcement Duties* and which results in Bodily Injury, Personal Injury or Property Damage during the Agreement Period." (Emphasis supplied.) Finally, "Law Enforcement Duties" are defined as "any of the duties or obligations performed or fulfilled by or for, or authorized by, *any Law Enforcement Agency of the Named Member. . . .*" (Emphasis supplied.)

The parties do not dispute that Harrison was an employee of Stephens County when he shot Ayers, but IRMA argues that regardless of any other policy language, Harrison was not a "member" covered under the Habersham and Rabun County policies because he was neither an "official, trustee, director, officer or employee" of Habersham or Rabun County acting within the scope of his duties when he shot Ayers, nor was he a volunteer authorized to act for or on behalf of Habersham or Rabun County. Ayers concedes that Harrison was not an official, trustee, or director

12

of these counties, but argues that he was a covered Member because he was acting on all three counties' behalf as a police "officer," as a "volunteer," and as an employee of each county that was participating in the joint venture of the task force.

As noted previously,

> Under Georgia rules of contract interpretation, words in a contract generally bear their usual and common meaning. OCGA § 13-3-2 (2). However, "if the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." OCGA § 13-2-2 (5). Georgia courts have long acknowledged that insurance policies are prepared and proposed by insurers. Thus, if an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured.

*Claussen v. Aetna Cas. & Surety Co.*, 259 Ga. 333, 334-335 (1) (380 SE2d 686) (1989). In other words, "the risk of any lack of clarity or ambiguity in an insurance contract must be borne by the insurer." Id. at 337 (3).

The policy does not define "officer," and we may look to dictionary definitions "to supply the plain and ordinary sense of a word." *Market Place Shopping Ctr. v. Basic Bus. Alternatives, Inc.*, 213 Ga. App. 722 (1) (445 SE2d 824) (1994). As Ayers notes, a common dictionary definition of "officer" is "one charged with police

duties."[4] See *Fowler v. Mitcham*, 249 Ga. 400, 401-402 (291 SE2d 515) (1982) (city policeman was a "municipal officer" and thus ineligible to also hold the position of city councilman under predecessor to OCGA § 36-30-4). Construing the ambiguity against the insurer, Harrison is an "officer" of Rabun and Habersham Counties and therefore a "Member" under those counties' policies.

We next consider whether Harrison's liability in the underlying event arose from a covered Occurrence under the Law Enforcement Liability section of those policies. The contracts provide that, to be covered, an Occurrence must arise from the conduct of Law Enforcement Duties "performed or fulfilled by *or for, or authorized by* any Law Enforcement Agency of the Named Member." (Emphasis supplied.) IRMA argues that the police powers of one county do not extend into another county without that county's consent, that the authority of a sheriff as a county officer is limited to the geographic territory of his county, and that the evidence showed that the sheriffs of Rabun and Habersham Counties deputized Harrison only so he could arrest people in their counties, not to authorize him to perform law enforcement duties on their behalf in Stephens County. But the issue is not the extent of the legal powers

---

[4]See Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/officer

the sheriffs granted to Harrison; the issue is whether, under the terms of the insurance contract, Harrison was conducting law enforcement duties that were authorized by the sheriffs, who are the "Law Enforcement Agency" of each county.

Under the terms of the Agreement that created the Mountain Judicial NCIS Team, the three sheriffs each agreed to cede control of one deputy sheriff each to the NCIS Team Commander and to allow that deputy to operate under the policies and procedures of the Team, as set by the Control Board. The record establishes that Harrison was working for the NCIS Team when he shot Ayers. The sheriffs authorized the Team to act within all three counties "to facilitate the investigation, arrest, prosecution and conviction of drug and violent crime offenders whose illicit activity *impacts the collective jurisdictions*." (Emphasis supplied.) In his deposition, the NCIS Team Commander agreed that the Team was not a unit of any of the three county sheriffs' departments but was "a law enforcement unit that reports to a control board of the collaborating agencies involved in the task force." Further, while each deputy assigned to the NCIS Team was paid by the county that hired him, each county was reimbursed for part of that salary from the grant money that flowed through the NCIS Team. All of the NCIS Team's operational expenses were paid by either the grant money or civil forfeiture proceeds that flowed from criminal

15

prosecutions initiated by the NCIS Team, and any money that exceeded expenses would be divided among the counties.

According the Habersham County Sheriff, the NCIS Team Commander was responsible for providing the training for the team members, including the required annual training to maintain POST certification, although the Commander testified that the deputies were responsible for overseeing their own annual training. The deputies assigned to the NCIS Team were subject to the oversight of the Team Commander, who was in charge of the unit, dealt with day-to-day operations, and was expected to adhere to the standard operating procedures (SOPs) enacted by the Control Board. Operational activities related to drug investigations were governed by the SOPs of the NCIS Team, although the SOPs were not formally approved by the Control Board until after Ayers was shot and killed.

Just before the shooting occurred, Harrison was riding in an unmarked Cadillac Escalade that was titled to the NCIS Team, owned by all three counties, and driven by the Team Commander. The Commander had authorized Harrison to carry a gun and to use force. The shooting was investigated by the Georgia Bureau of Investigations, not the Stephens County Sheriff's Department, and the NCIS Team Commander gave each sheriff a copy of the resulting GBI report.

In summary, Harrison was acting on behalf of the NCIS Team when the shooting occurred. In the Intergovernmental and Intra-Agency Agreement, all three counties authorized agents assigned to the NCIS Team to act on their behalf in a concerted effort to stem violence and the drug trade in the three-county region. Accordingly, the insurance policies of Rabun and Habersham Counties also provide liability coverage for Harrison's law enforcement activities that resulted in the occurrence at issue, and the trial court erred in holding otherwise.[5]

2. Ayers also argues that the trial court erred in concluding that she was precluded from recovering under the Habersham and Rabun County insurance contracts due to anti-stacking provisions.

"Keeping in mind that the definition of 'stacking' means that two or more coverages must be otherwise applicable to a given loss, an uninsured should generally have the right to stack these coverages as long as stacking is not prohibited by any statute, regulation, unwritten public policy, or valid contract term." 12 Couch on Ins.

---

[5]Ayers also argues that Harrison should be covered under all three county policies due to public policy considerations, noting that legal liabilities arise in a number of ways against officers who are assigned by one jurisdiction to work on behalf of other jurisdictions and that this task force was recently implicated in the use of a flash grenade against an infant. Because we conclude that Deputy Harrison is covered under the terms of the insurance contracts, we need not reach this issue.

3d § 169:13. "In general, Georgia law allows an insured to stack the limits of liability provided by [s]eparate policies to the extent of the insured's expense. However, the policy language itself may bar the stacking of such coverage." (Citations omitted.) *Ga. Farm Ins. Co. v. Shook*, 215 Ga. App. 66, 67 (449 SE2d 658) (1994). Further,

> In construing an insurance policy, the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney. And, it is the insurer's duty to define clearly and explicitly limitations on coverage.

(Footnotes and punctuation omitted.) *Continental Ins. Co. v. American Motorist Ins. Co.*, 247 Ga. App. 331, 334-335 (1) (542 SE2d 607) (2000).

> IRMA contends that the following language prevents the stacking of coverage:

> IRMA's liability for damages as the result of any one Occurrence or Wrongful Act shall be only the maximum Agreement limit less the amount of the Named Member's deductible. . . . This is the maximum amount IRMA will pay for damages as the result of any one Occurrence or Wrongful Act regardless of the number of Members, automobiles or vehicles involved, claims made or Suits brought, persons or organizations making claims or bringing suits, or premiums paid.

IRMA further argues that the policies' language limiting its liability for damages resulting from any one Occurrence is "clear and prevents the stacking of limits," "clearly state[s]" that IRMA's maximum liability for an Occurrence is the maximum amount provided by the policy, and that the policies' "clear intent was to limit the exposure of the counties' insurance pool."

IRMA has offered no authority for the proposition that limiting the payment under one policy to the maximum limits of liability per occurrence also limits the coverage under an entirely different contract, rather than simply limiting the maximum liability under the contract containing the limiting language. "The insurer in preparing its policy has the burden of using language that is clear and precise," and absent clear and precise language of exclusion, none exists. *Travelers Indem. Co. v. Whalley Constr. Co.*, 160 Ga. App. 438, 440-441 (287 SE2d 226) (1981).

Because the insurance policies issued to Rabun and Habersham Counties do not explicitly limit their coverage to prohibit stacking, the trial court erred in granting summary judgment to IRMA and denying summary judgment to Ayers.

*Judgment reversed. Boggs and Branch, JJ., concur*.